**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-1161-WJM-CBS

AMICA LIFE INSURANCE COMPANY,

      Plaintiff,

v.

MICHAEL P. WERTZ,

      Defendant.

---

**ORDER GRANTING SUMMARY JUDGMENT IN PART AND *SUA SPONTE*
CERTIFYING QUESTION OF LAW TO THE COLORADO SUPREME COURT**

---

Under the separation-of-powers principles inherent in the Colorado Constitution, a Colorado administrative agency may not lawfully promulgate rules and regulations that conflict with a Colorado statute.  But, may the Colorado Legislature enact an *interstate* compact creating an *interstate* administrative agency with lawful power to promulgate rules and regulations that conflict with a Colorado statute?

The question arises in this case, sadly, from the suicide of a Colorado resident, Martin Fisher ("Fisher"), fourteen months after Plaintiff Amica Life Insurance Company ("Amica") issued him a life insurance policy.  The policy contains a two-year suicide exclusion, and such an exclusion is permissible under a regulation promulgated by an administrative agency created by an interstate compact to which Colorado is a party.  A Colorado statute, however, nullifies suicide exclusions longer than one year.  *See* Colo. Rev. Stat. § 10-7-109.  If Colorado may validly delegate authority to an interstate administrative agency to develop insurance standards that may conflict with Colorado

insurance statutes, then Amica's two-year exclusion is valid.  Otherwise, Amica's exclusion is invalid and Amica owes the death benefit to Fisher's beneficiary, Defendant Michael P. Wertz ("Wertz").

This dispute is currently before the Court on Amica's motion for summary judgment (ECF No. 67), and the proper outcome under Colorado law is unclear given Colorado's pragmatic approach to issues of legislative delegation.  Yet the answer is of great public policy importance.  If "yes," it demonstrates that the Colorado Legislature may, in certain circumstances, delegate to an administrative body the ability to make law superior to its own.  If "no," then Colorado's ability to participate in some interstate compacts becomes significantly limited, and the entire basis of the interstate compact at issue here—the Interstate Insurance Product Regulation Compact—is called into question.

For the reasons explained below, the Court rules in Amica's favor on certain factual questions presented in Amica's summary judgment motion.  However, as to the ultimate legal question, the Court *sua sponte* certifies it to the Colorado Supreme Court.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. STATUTORY BACKGROUND

Understanding anything else in this case first requires understanding the Interstate Insurance Product Regulation Compact, which has been enacted by the Colorado Legislature at Colorado Revised Statutes § 24-60-3001 ("Insurance Compact" or "Compact"). Having enacted the Insurance Compact, Colorado participates with most of the other states in the Union in an arrangement intended "[t]o develop uniform standards" for "individual and group annuity, life insurance, disability income and long-term [care] insurance products." *Id.*, art. I, §§ 1, 2; *see also id.*, art. II, § 11.[1]

The Compact creates the Interstate Insurance Product Regulation Commission ("Interstate Commission" or "Commission"), "a joint public agency" to which each

---

[1] According to the Compact's website (insurancecompact.org, last visited Aug. 31, 2017), all states have joined save for California, Delaware, Florida, New York, North Dakota, and South Dakota.

compacting state may send one representative.  *Id.*, art. III, § 1; art.  V, § 1(a).  The

Commission is empowered to promulgate "Uniform Standards" for insurance products

"which shall have the force and effect of law and shall be binding in the Compacting

States."  *Id.*, art. II, § 15; art. IV, § 1; art. VII, § 1.  Insurance companies may then

submit insurance products to the Interstate Commission for approval under the Uniform

Standards, and such approval authorizes the insurance company to sell that product in

any Compact member state in which the company is otherwise authorized to do

business.  *Id.*, art. X, §§ 1, 3.  In short, the Interstate Commission acts as a near-

national insurance commissioner with respect to "individual and group annuity, life

insurance, disability income, and long-term [care] insurance products."  *Id.*, art. I, § 1.

In promulgating Uniform Standards, the Insurance Compact requires the

Interstate Commission to follow "a rulemaking process that conforms to the Model State

Administrative Procedure Act of 1981 as amended, as may be appropriate to the

operations of the Commission."  *Id.*, art. VII, § 2.  Moreover, "[b]efore the Commission

adopts a Uniform Standard, the Commission shall give written notice to the relevant

state legislative committee(s) in each Compacting State responsible for insurance

issues of its intention to adopt the Uniform Standard."  *Id.*  Uniform Standards become

effective ninety days after promulgation "or such later date as the Commission may

determine."  *Id.*, art. VII, § 3.

Any member state of the Compact may opt out of a Uniform Standard "either by

legislation or regulation duly promulgated by the Insurance Department under the

Compacting State's Administrative Procedure Act." *Id.*, art. VII, § 4. If a state opts out after a Uniform Standard has gone into effect, the opt out is prospective only. *Id.*, art. VII, § 5.

"[I]n the event the Commission exercises its rulemaking authority in a manner that is beyond the scope of the purposes of this [Compact], or the powers granted hereunder, then such an action by the Commission shall be invalid and have no force and effect." *Id.*, art. VII, § 1. But, if "any person" wishes to challenge a Uniform Standard, that person must file such a challenge within thirty days of the Uniform Standard's promulgation. *Id.*, art. VII, § 7. In reviewing the challenge, "[t]he court shall give deference to the actions of the Commission consistent with applicable law and shall not find the Rule[2] or Operating Procedure to be unlawful if the Rule or Operating Procedure represents a reasonable exercise of the Commission's authority." *Id.*

### III. FACTS

The following facts are undisputed unless attributed to one party or another, or otherwise noted.

**A.      The Two-Year Suicide Exclusion Standard**

Colorado enacted the Insurance Compact in 2004, with an effective date of August 4, 2005. (ECF No. 67 at 3, ¶ 1.) The Colorado Legislature designated the state insurance commissioner as Colorado's representative at the Interstate Commission. Colo. Rev. Stat. § 24-60-3001, Preamble. The Interstate Commission itself became

---

[2] "Rule" is defined to include any Uniform Standard. *Id.*, art. II,, § 12.

operational in June 2006.  (ECF No. 67 at 4, ¶ 4.)

On January 24, 2007, the Commission published notice of its intent to adopt its Individual Term Life Insurance Product ("ITLIP") Standards.  (*Id.* at 6, ¶ 18.)  Amica claims that, on May 1, 2007, the Commission provided notice of the pending ITLIP Standards to "the chairs, ranking members, and members of the Colorado General Assembly's (i) House Business Affairs and Labor Committee and (ii) Senate Business Labor and Technology Committee."  (*Id.* ¶ 21.)  Wertz denies this.  (ECF No. 70 at 3, ¶ 21.)  The Court will address whether Wertz's denial creates a genuine issue of material fact in Part V.B, below.  Regardless, the parties agree that the House and Senate committees named above were the proper committees to which the Interstate Commission was required to provide notice.  (ECF No. 67 at 6, ¶ 23.)

The Interstate Commission held a public hearing regarding the ITLIP Standards on May 16, 2007.  (*Id.* at 7, ¶ 24.)  That is also the date of the last written comment the Commission received regarding the ITLIP Standards.  (*Id.* ¶ 27.)

The ITLIP Standards were formally adopted by the Interstate Commission on June 1, 2007, with a declared effective date of September 6, 2007.  (*Id.* ¶ 31.)  The ITLIP Standards declare that any suicide exclusion in an approved policy must be no longer than two years from the date the policy is issued.  (*Id.* ¶ 32.)  Colorado has never opted out of that Uniform Standard—or, for that matter, any Uniform Standard.  (*Id.* at 13, ¶¶ 83–84.)

**B.** **Fisher's Policy, His Suicide, and Wertz's Claim**

In October 2011, the Interstate Commission approved an individual term life insurance product submitted by Amica.  (*Id.* at 10, ¶ 55.)  That product, as approved, excluded death benefits if death of the insured was caused by suicide within two years from the policy's issuance.  (*Id.* ¶ 57.)  In such a circumstance, Amica's only obligation was to refund the policy premium.  (*Id.*)

On January 28, 2014, Amica issued to Fisher one of the aforementioned life insurance policies.  (*Id.* ¶ 58.)  Fisher committed suicide about fourteen months later, on March 12, 2015.  (*Id.* at 11, ¶ 71.)  On May 1, 2015, Defendant Wertz, who was Fisher's named beneficiary under the policy, submitted a claim for the death benefit, citing Colorado Revised Statute § 10-7-109.  (*Id.* at 12, ¶ 72.)  That section reads in relevant part as follows: "The suicide of a policyholder after the first policy year of any life insurance policy issued by any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy . . . ."[3]  In other words, Wertz believed Colorado's one-year exclusion applied, not the policy's Commission-approved two-year exclusion.  Amica stood by the two-year exclusion, denied Wertz's

---

[3] Although the statute is framed in terms of a defense, courts have long held that it establishes a substantive standard for life insurance contracts in Colorado.  *See Aetna Life Ins. Co. v. Braukman*, 70 F.2d 647, 651 (10th Cir. 1934) ("The statute becomes a constitutent part of the contract . . . ."); *McCowan v. Equitable Life Assur. Soc'y*, 179 P.2d 275, 277 (Colo. 1947) ("The suicide provision of the policy was a nullity, and was void and of no effect at the time it was written.  The inhibition of the statute, in legal contemplation, was substituted for the void provision and became binding upon the parties."); *Mass. Protective Ass'n v. Daugherty*, 288 P. 888, 889 (Colo. 1930) ("any provision in a policy attempting to relieve an insurer from liability in case of suicide is a nullity [if contrary to the one-year exclusion statute]").

claim, and refunded the premium.  (*Id.* ¶ 73.)

## IV. PROCEDURAL HISTORY

Anticipating that Wertz would file suit, Amica filed a declaratory judgment action in this Court in June 2015.  (ECF No. 1.)  Wertz answered and affirmatively defended that the two-year suicide exclusion violated Colorado law and must be declared unenforceable.  (ECF No. 24 at 4, ¶ 20.)  Wertz also counterclaimed for reformation of the policy, breach of contract, and common-law bad faith breach of insurance contract. (*Id.* at 9–12.)

At first, the parties agreed "the material facts of this matter were not in dispute" (ECF No. 39 ¶ 2) and the resolution "depended entirely upon a question of law" (ECF No. 45 at 1), namely, which source of authority controls: Colorado Revised Statute § 10-7-109 or the ITLIP Standards?  Amica therefore filed what was, in effect, a motion for judgment on the pleadings to resolve the question of law.  (ECF No. 25; *see also* ECF No. 49 at 3 n.1.)  Amica naturally argued that Colorado had enacted the Insurance Compact and, in so doing, declared that the Interstate Commission's duly promulgated Uniform Standards have the force and effect of law; therefore, the ITLIP Standards apply.  Wertz's primary response was that the Compact, or at least its application in this case, violates the Colorado Constitution.  Specifically, Wertz argued that the Compact is an unconstitutional delegation of legislative power, violates separation-of-powers principles, and violates the guarantees of equal protection and freedom from special legislation.  (ECF No. 30-1 at 3–18.)

8

In reply, Amica relied heavily on the Compact's opt-out provisions. (ECF No. 33 at 5–6.) Amica characterized the ability to opt out as "the ultimate safeguard against the exercise of unbridled discretion by the Commission" (ECF No. 33 at 5), thus mollifying the Colorado Supreme Court's charge that "individuals be protected against the unnecessary and uncontrolled exercise of . . . discretionary power" by bodies to whom legislators have delegated rulemaking authority. *Cottrell v. City & Cnty. of Denver*, 636 P.2d 703, 709 (Colo. 1981).

Two months after Amica filed its reply, and before this Court had decided Amica's motion, Wertz filed a motion to amend his answer and counterclaims. (ECF No. 39.) Wertz there claimed "ongoing investigation and research under further inquiry" which has led him to "believe[] that the Commission failed to promulgate the [ITLIP Standards] in accordance with the Compact's terms." (*Id.* ¶ 2.) Therefore, according to Wertz, the ITLIP Standards might be invalid under the Compact's own terms. Wertz claimed that this would "impact the constitutionality of the Compact statute." (ECF No. 39 ¶ 2.) Another implication, of course, would be that this Court might not need to reach the constitutional questions, should Wertz turn out to be correct.

The Court resolved Amica's and Wertz's respective motions by denying the former without prejudice and granting the latter. (ECF No. 49.) The Court reasoned that "the constitutionality of the Compact is a weighty issue that this Court should avoid if there is a colorable possibility that the case can be decided on other grounds, such as the potential procedural irregularity that Wertz raises." (*Id.* at 7.) The Court therefore

sent the parties to discovery on the question of "the procedural regularity of the [ITLIP] Standards." (*Id.* at 8.)

That discovery is now closed, and Amica has filed its motion for summary judgment, claiming no genuine dispute of material fact on the procedural regularity of the ITLIP Standards, and renewing its argument that those Standards control over Colorado Revised Statute § 10-7-109. (ECF No. 67.)[4]

## V. ANALYSIS

### A. Timeliness of Wertz's Challenge

The Interstate Compact requires that any action seeking judicial review of a Uniform Standard be brought within thirty days of promulgation. Colo. Rev. Stat. § 24-60-3001, art. VII, § 7. The ITLIP Standards were promulgated on June 1, 2007. Wertz raised his current counterclaim theory—*i.e.*, that the Interstate Commission did not give proper pre-promulgation notice of the ITLIP Standards to the Colorado Legislature—for the first time on January 21, 2016. (ECF No. 39.) Amica accordingly argues that "any procedural challenge" to the ITLIP Standards is now foreclosed as untimely. (ECF No. 67 at 24.)

There are colorable counterarguments to this position. For example, is a challenge in the context of a dispute between insurer and beneficiary the same as

---

[4] Amica also moved on Wertz's equal protection and special legislation theories. (ECF No. 67 at 30–33.) Wertz did not respond to these arguments, and is therefore deemed to have abandoned them. *See, e.g.*, *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 933 (10th Cir. 2015); *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001); *Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009).

"judicial review" under the Insurance Compact (which presumably has in mind an action against the Interstate Commission directly)? Or, may the Colorado Legislature, consistent with due process, create a statute of limitations as short as thirty days? But Wertz does not raise these arguments. In fact, he entirely ignores Amica's timeliness argument. The Court therefore deems him to have conceded that his challenge to the procedural regularity of the ITLIP Standards is untimely.

**B.     Lack of a Genuine Dispute of Material Fact**

Alternatively, the Court finds that there is no genuine dispute of material fact over whether the Interstate Commission provided proper pre-promulgation notice of the ITLIP Standards to the Colorado Legislature.

The sole relevant factual dispute—genuine or otherwise—is whether the Interstate Commission actually *sent* notice of the ITLIP Standards to the Colorado Legislature ahead of those Standards' promulgation. Amica offers the affidavit of Karen Schutter, the Interstate Commission's executive director. (ECF No. 67-1 at 1, ¶ 1.) Schutter claims to be an authorized records custodian for the Commission. (*Id.* at 2, ¶ 6.) Schutter says that the requisite notice to the Colorado Legislature was sent on May 1, 2007 (*id.* ¶ 14), which obviously predates the ITLIP Standards' promulgation on June 1, 2007. Schutter attaches to her affidavit a document ("Exhibit D") that appears to be a sort of cover letter, directed to all relevant state legislative committees and announcing the Interstate Commission's consideration of the ITLIP Standards, among others. (ECF No. 67-1 at 31.) Schutter does not claim that Exhibit D was the notice

itself, but rather describes it as the "content of the notice" sent to the Colorado Legislature.  (*Id.* at 6, ¶ 14.)

Wertz's response is essentially twofold.  First, Wertz points out that the Interstate Commission, in response to his records request, stated that the May 2007 notice to state legislatures has already been destroyed pursuant to the Commission's five-year records retention schedule.  (ECF No. 70 at 3, ¶ 21.)  Thus, he attacks Exhibit D— although, surprisingly, *not* on authenticity grounds.  He does not, for example, dispute that Exhibit D embodied the "content of the notice."  He instead simply asserts,

> Exhibit D to the Schutter Affidavit does not establish that the Commission sent the requisite Legislative Notice on May 1, 2007, or any other time prior to adopting the ITLIP Standards.  Nor does Exhibit D establish that the Commission sent the requisite Legislative Notice to the proper members of the Colorado General Assembly.

(*Id.*; *see also id.* at 20 (repeating the same arguments).)  Second, Wertz notes that Schutter began her employment with the Interstate Commission in December 2008, after the May 2007 notice was allegedly sent, and therefore she lacks personal knowledge regarding that matter.  (*Id.* at 3, ¶ 21.)

Wertz's arguments are somewhat misdirected.  In Colorado, administrative action is entitled to a presumption of regularity.  *Marshall v. Civil Serv. Comm'n*, ___ P.3d ___, ___, 2016 WL 6122814, at *4 (Colo. App. 2016), *cert. denied sub nom. Marshall v. City & Cnty. of Denver*, 2017 WL 3594017 (Colo. Aug. 21, 2017).  If Wertz had brought a timely judicial review challenge directly against the Interstate Commission, Wertz would have borne the burden to rebut the presumption of regularity.  *Id.*; *see also* 3 Charles H.

12

Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 9:13 (3d ed., Feb. 2017 update).  Wertz offers no reason why he does not bear the same burden as to his counterclaim against Amica based on the alleged irregularity of the ITLIP Standards, nor does the Court independently discern any reason.[5]  The Court holds, therefore, that the burden of proof rests on Wertz, just as it would in a normal action for judicial review.

In that light, it was Wertz's burden in his summary judgment response brief to present the evidence by which a reasonable jury could conclude that the May 2007 legislative notice was never sent.  Viewing Wertz's response generously, it appears he proffers only two items of evidence: (1) the Interstate Commission's admission that it no longer possesses the actual May 2007 notice; and (2) the fact that the Commission was able to produce legislative notices sent in 2008 and 2010, both of which also should have been destroyed under the Commission's five-year retention schedule (*see* ECF No. 70 at 19 n.1)—apparently insinuating that the retention schedule explanation as to the May 2007 notice is suspect.

The Court holds that these two items, viewed together and in the light most favorable to Wertz, are no more than a scintilla of evidence that the Interstate Commission failed to provide pre-promulgation notice of the ITLIP Standards to the Colorado Legislature on May 1, 2007.  In other words, no reasonable jury could find that Wertz carried his burden on this question.  Accordingly, there is no *genuine* dispute of material fact as to pre-promulgation notice.

---

[5] Indeed, Wertz's response brief is devoid of any recognition that a question of burden might exist.

**C.      The "Consider Fully" Clause**

Wertz also advances a rather creative alternative argument that the ITLIP

Standards were invalidly promulgated.  His argument is grounded in the following two

sentences of the Insurance Compact:

> Before the Commission adopts a Uniform Standard, the
> Commission shall give written notice to the relevant state
> legislative committee(s) in each Compacting State
> responsible for insurance issues of its intention to adopt the
> Uniform Standard.  The Commission in adopting a Uniform
> Standard shall consider fully all submitted materials and
> issue a concise explanation of its decision.

Colo. Rev. Stat. § 24-60-3001, art. VII, § 2.  Wertz interprets the second sentence to

mean that the Interstate Commission must "'consider fully' all materials submitted in

response" to the notice given in the first sentence.  (ECF No. 70 at 20.)  Therefore, he

says, "[n]otice must be sent in a timeframe that allows sufficient time for the legislature

to react and respond."  (*Id.*)  But, he continues, the notice was allegedly sent on May 1,

2007, and the Colorado Legislature's 2007 session ended on May 4, 2007.  (*Id.*)  Thus,

the Commission supposedly violated its "consider fully" duty by not giving the Colorado

Legislature time to submit any response or comment.

Wertz's interpretation simply has no support in the statutory language.  The

second sentence quoted above speaks of the rulemaking process generally.  It has

nothing to do with waiting for a particular legislature to submit written materials.  This

argument therefore fails as a matter of law.

**D.     Validity of the Compact Under the Colorado Constitution**

Given the foregoing, the constitutional question cannot be avoided.  To frame that question, the Court notes the following.

Under article III of the Colorado Constitution, "[o]nly the legislature has the power to amend laws."  *Miller Int'l, Inc. v. Colo. Dep't of Revenue*, 646 P.2d 341, 345 (Colo. 1982).  Thus, "a regulation must further the will of the legislature and may not modify or contravene an existing statute."  *Id.* at 344.  "[A]ny regulation which is inconsistent with or contrary to a statute is void and of no effect."  *Id.*

Given this, Colorado's insurance commissioner could not, by regulation, extend the life insurance exclusion in Colorado Revised Statute § 10-7-109 from one year to two.  *Cf. Travelers Indem. Co. v. Barnes*, 552 P.2d 300, 304 (Colo. 1976) (invalidating regulation jointly promulgated by the state insurance commissioner and state revenue commissioner because it "[did] not conform to the stated legislative purpose of the [relevant statute], [was] not consistent with all other portions of the Act, and change[d] long-standing insurance practices").  On this much, Amica and Wertz agree.

Amica argues, however, that interstate compacts operate in a different legal dimension, where things can happen that normally do not happen—such as where a legal authority normally on par with or even subordinate to a state statute nonetheless takes precedence.  Amica cites numerous cases supposedly upholding this proposition. (ECF No. 67 at 21–24.)

As the Court will explain below, Amica's cited cases do not demonstrate that

interstate compacts function outside the normal channels of legal authority. Rather, they show that *if* Congress has *approved* an interstate compact, then the compact is deemed to be federal legislation and overrides any conflicting state authority by virtue of the Supremacy Clause. *See* U.S. Const., art. VI, cl. 2. The Insurance Compact is not congressionally approved, and likely need not be, given that Congress has specifically declared insurance to be a matter primarily of state, not federal, concern. *See* 15 U.S.C. § 1012. As to compacts that do not receive congressional approval, such as the Insurance Compact, Amica's case law shows that they are treated as contracts between the states. But that is irrelevant if the Colorado Constitution does not permit the Colorado Legislature to enter into the particular contract at issue here. Amica's cases mostly come nowhere close to that question. The one case that comes within shouting distance (*Frontier Ditch*, discussed below in Part V.D.3) does so only indirectly and ambiguously.

1. *Green* (U.S. 1823)

Amica's first citation is to *Green v. Biddle*, 21 U.S. 1 (1823), which involved a dispute over Virginia land titles granted in what later became the State of Kentucky. When Kentucky became a state, it entered into a compact with Virginia that all legal interests in land established under Virginia law before Kentucky existed must be preserved. *Id.* at 3. Kentucky included the terms of that compact in its first state constitution. *Id.* at 3–4. A later Kentucky statute threatened this arrangement, however, thus prompting the lawsuit that eventually made it to the Supreme Court. The Supreme

Court held that the compact between Virginia and Kentucky was a contract and that Kentucky "was incompetent to violate that contract, by passing any law which rendered those rights less valid and secure." *Id.* at 92–93.

*Green* only shows that, once a state has bound itself by an interstate compact, it cannot pass legislation contradicting the compact. It does not inform the question of whether the Colorado Constitution permits the Colorado Legislature, through an interstate compact, to delegate rulemaking power that may contradict an existing state statute.

2.    *Hinderlider* (U.S. 1938)

Amica next points to *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92 (1938). This case involved the La Plata River Compact, adopted by Colorado and New Mexico (and approved by Congress) in the early 1920s to facilitate equitable apportionment of La Plata River waters between the two states.[6] The compact generally provided (and still provides) that, from February 15 to December 1 of each year, Colorado was required to allow half of the river's water to cross into New Mexico. *Id.* at 96–97. However, if the two states' respective state engineers agreed that the river was particularly low and that it would be more efficient to alternate between all of the water going to Colorado for a certain number of days and then all of the water going to New Mexico for an equal number of days, the compact permitted such alternation. *Id.* at 97.

_____

[6] The La Plata River Compact is currently codified at Colo. Rev. Stat. § 37-63-101.

The summer of 1928 was particularly dry and the Colorado and New Mexico state engineers invoked the alternation procedure. *Id.* One particular Colorado ditch company, deprived of the water flow it otherwise would have received, filed suit, claiming that the compact could not interfere with vested private rights to water appropriations. *Id.* at 98–99. The United States Supreme Court rejected this reasoning, in part because states have a federal common law duty to equitably apportion between themselves the water of shared rivers, and that duty supersedes whatever rights may be vested under state law. *Id.* at 101–03.

*Hinderlider* is thus inapposite. It involved state executive officers exercising their discretion to do something specifically contemplated in the compact (alternating water flow, rather than permitting half of the river to pass into New Mexico), and it further involved supervening federal common law. It did not involve an interstate commission's exercise of rulemaking authority to establish a standard that contradicts an existing state statute.

   3.   *Frontier Ditch* (Colo. 1988)

Amica cites *Frontier Ditch Co. v. Southeast Colorado Water Conservancy District*, 761 P.2d 1117 (Colo. 1988), which involved the Arkansas River Compact between Colorado and Kansas, *see* Colo. Rev. Stat. § 37-69-101. Frontier Ditch addressed a fairly unique situation, namely, "[t]he Frontier Canal, which since 1895 has been diverting water from the Arkansas River and its tributaries *in Colorado* for the irrigation of lands *located entirely in Kansas.*" *Id.* at 1118 (emphasis added). The

negotiators of the Arkansas River Compact had "considerable discussion" on the question of how to address this particular canal, which defied tidy jurisdictional categorization. *Id.* The result was an agreement that "'Colorado concede[d] to Kansas . . . exclusive administrative control over the operation of the Frontier Canal and its headworks . . . to the same extent as though said works were located entirely within the state of Kansas.'" *Id.* at 1119 (quoting Colo. Rev. Stat. § 37-69-101, art. VI(B)) (emphasis removed).

The Frontier Ditch Company eventually filed suit in a Colorado water court "for the alleged purpose of protecting its appropriation from junior Colorado appropriators." *Id.* The Colorado state courts refused to hear the case in light of the compact's clause about Kansas's "exclusive administrative control" over the Frontier Canal. *Id.* at 1119–20. Frontier Ditch Company argued against the plain meaning of that term, however, because it would allegedly violate Colorado's duty "to protect the right of appropriation." *Id.* at 1123. The Colorado Supreme Court agreed that such a duty existed, but

> recognition of such a duty does not mean that the state is powerless to enter into an interstate compact and thereby delegate this duty to a sister state. Indeed, it has long been accepted that the equitable apportionment of interstate waters may be accomplished through the use of an interstate compact. Even though existing statutory schemes might well result in a different apportionment of waters, the provisions of such a compact bind the states and their citizens. [Citing *Hinderlider*.] Clearly, if a state may equitably apportion interstate waters through the use of an interstate compact, a state may also agree that the sister state to which the water is equitably apportioned will have exclusive authority over the determination of an applicant's right to divert the water and the administration of any such

decreed water right.

*Id.* at 1123 (citations omitted).  The Colorado Supreme Court also reasoned that "the Compact here is not only part of our state statutory law, but is also part of federal law, having been approved by an act of Congress . . . , and is thus preemptive of any conflicting state law on the same subject."  *Id.*

Amica recognizes that the second reason does not have any force here.  (ECF No. 67 at 13–14 n.3.)  But Amica highlights the Colorado Supreme Court's statement from the above-quoted paragraph that "[e]ven though existing statutory schemes might well result in a different apportionment of waters, the provisions of such a compact bind the states and their citizens."  (ECF No. 67 at 22 (internal quotation marks omitted).)

*Frontier Ditch* contains no elaboration on this statement.  The court appears to be referring to Colorado's Water Right Determination and Administration Act of 1969, Colo. Rev. Stat. §§ 37-92-101 to -602 ("Water Act").  *See* 761 P.2d at 1120 & n.2 (summarizing the plaintiff's argument for applying the Water Act).  The Water Act establishes, among other things, Colorado's water court system and the principles for resolving water disputes.  *See, e.g.*, Colo. Rev. Stat. §§ 37-92-203, -305.  When *Frontier Ditch* refers to the possibility that "existing statutory schemes might well result in a different apportionment of waters," it is not clear whether it means to say that the Water Act (or another statute) would offer some sort of substantive guarantee under the circumstances, such as a certain minimum number of acre-feet; or, by contrast, only that procedures may differ between a Colorado water court and a corresponding court

or agency in Kansas, and those procedural differences might lead to different outcomes under the circumstances of a particular case.

If *Frontier Ditch* had in mind a substantive guarantee, then it looks much more like the case presented here, *i.e.*, a statutory guarantee that suicide exclusions in life insurance policies cannot exceed one year.  On the other hand, if *Frontier Ditch* only contemplated potential procedural differences, then the analogy to this case becomes much thinner.  Under the Water Act, the Colorado Legislature had vested authority in a system of water courts to adjudicate water rights disputes, but under the Arkansas River Compact, the Colorado Legislature carved out a certain part of that authority and transferred it to Kansas's water adjudication system.

In short, the scope of *Frontier Ditch*'s statement that the Arkansas River Compact might upset "existing statutory schemes" is unclear.

4.     *Hellmuth* (D. Md. 1976)

Amica next cites *C. T. Hellmuth & Associates, Inc. v. Washington Metropolitan Area Transit Authority*, 414 F. Supp. 408 (D. Md. 1976).  This case centered around the Washington Metropolitan Area Transit Authority Compact, Pub. L. No. 89-774, 80 Stat. 1324, 1350 (1966), which established the joint public transit system that serves Washington, D.C., and its Virginia and Maryland suburbs.  The plaintiff had unsuccessfully sought to be the life insurance provider to the Transit Authority and invoked Maryland's freedom-of-information statute to compel the Transit Authority to release information about that the Authority's decision to select another insurer.  414 F.

Supp. at 409. The question presented, therefore, was whether the Transit Authority fell "within the purview of the Maryland Act." *Id.* The district court answered in the negative, and in doing so set forth a general principle on which Amica relies, namely, that "[u]pon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law." *Id.*

This is indeed a very broad statement. However, Amica fails to address two distinctions. First, the compact creating the Transit Authority was approved by Congress, and so is necessarily superior to Maryland law. Second, *Hellmuth* has nothing to do with the precise question at issue, *i.e.*, whether an administrative body created by an interstate compact can promulgate rules that supersede a particular state's statutory enactments. *Hellmuth* thus provides little guidance in the present circumstances.

5.  *McComb* (3d Cir. 1991)

Amica's next citation is to *McComb v. Wambaugh*, 934 F.2d 474 (3d Cir. 1991). *McComb* was a civil rights action that turned, in part, on whether the Interstate Compact for Placement of Children applied to proceedings purportedly under that compact to return a child to his or her natural parents. *Id.* at 478–82. The Third Circuit answered in the negative. *Id.* at 482. In the process, it noted certain general principles on which Amica relies: "Having entered into a contract [by joining an interstate compact], a participant state may not unilaterally change its terms. A Compact also takes

precedence over statutory law in member states." *Id.* at 479.

Amica emphasizes *McComb*'s observation that a participant state may not unilaterally change the terms of a compact. Amica seems to be saying that allowing Colorado's one-year suicide exclusion to control despite the Interstate Commission's two-year exclusion is effectively the same as allowing Colorado to unilaterally change the terms of the Interstate Compact. The analogy does not work in these circumstances. A ruling in favor of Wertz would not change the terms of the Insurance Compact. It would certainly change Colorado's relationship to the Insurance Compact, and it would call into question whether Interstate Commission-approved policies are truly enforceable as written in Colorado. Indeed, it might invalidate the Compact as it applies in Colorado. But the Insurance Compact would remain unaltered.

*McComb*'s assertion that a compact takes precedence over member states' statutes has much more relevance, particularly because the Interstate Compact for Placement of Children (like the Insurance Compact) was not approved by Congress. *See id.* Nonetheless, the scope of *McComb*'s assertion is not clear. *McComb* cited nothing to support this proposition, but it is probably unobjectionable if *McComb* meant to say that the terms of a compact, when enacted as a state statute, have superiority when in conflict with other state statutes. In both cases, legislation is at issue, and a state legislature can allow one statute to supersede another.

Again, however, the dispute between Amica and Wertz is not a conflict of statutes. It is a conflict of a preexisting Colorado statute and an administrative

regulation promulgated by an interstate agency created by a Colorado statute. *McComb* has nothing to say on this specific scenario, although perhaps it implies that interstate compacts and everything that flows from them (potentially including administrative regulations) take precedence over conflicting state statutes—otherwise, an interstate compact could not achieve its desired effect.  It is nonetheless difficult to be sure that *McComb* meant to go this far, given that the question was not before the court.

Interestingly, *McComb* applied Pennsylvania law to invalidate a regulation promulgated by the interstate commission administering the Interstate Compact for Placement of Children, because the regulation conflicted with the compact itself, which had been enacted in Pennsylvania.  *Id.* at 481.  Specifically, the commission administering the compact had issued a regulation interpreting the compact to apply to circumstances when a child was being transferred across state lines to live with that child's parent.  The Third Circuit found this interpretation untenable in light of the language of the compact itself.  But this provides no guidance on whether an interstate administrative body's regulation can supersede some other state statute.  Nonetheless, this same dispute will arise again in another case discussed below (Part V.D.8).

6.    *Alcorn* (D.D.C. 1993)

Amica's next citation, *Alcorn v. Wolfe*, 827 F. Supp. 47 (D.D.C. 1993), explores the relationship between the Metropolitan Washington Airports Authority Compact and Virginia's statute adopting the compact.  The compact called for the governor of Virginia

to appoint representatives to a joint commission, but Virginia's enabling statute went further to say that the governor's appointments must be confirmed by the Virginia legislature. *Id*. at 48–49. The district court held that the requirement of legislative approval conflicted with certain portions of the compact and therefore was preempted: "In light of the Supremacy Clause to the United States Constitution, and because compacts are analogous to contracts between states, the terms of the MWAA compact cannot be modified unilaterally by state legislation and [the compact's terms] take precedence over conflicting state law." *Id*. at 52 (citations omitted).

*Alcorn*'s reference to the Supremacy Clause has no relevance here. *Alcorn*'s reference to contract principles similarly has no relevance, as already explained in the prior discussion of the *McComb* decision.

### 7. *Doe* (W.D. Pa. 2000)

Amica also cites *Doe v. Ward*, 124 F. Supp. 2d 900 (W.D. Pa. 2000), which held that the congressionally-approved Interstate Parole Compact prohibited Pennsylvania from imposing different conditions on sex offender parolees transferring from out-of-state than on sex offender parolees convicted of their sex offenses within Pennsylvania. *Id*. at 912–16. Amica cites Doe apparently for the same general proposition already discussed in *McComb* and *Alcorn*, namely, that a state may not unilaterally alter an interstate compact. For the same reasons already discussed above, the Court finds that proposition irrelevant here.

8.    *Leonardo* (Ariz. App. 2001)

Finally, Amica offers *Arizona Department of Economic Security v. Leonardo*, 22 P.3d 513 (Ariz. App. 2001).  *Leonardo*, like *McComb*, involved the Interstate Compact on the Placement of Children; and the question presented was the same presented in *McComb*, namely, whether the interstate commission administering that compact validly interpreted it to apply to situations in which a child is being transferred across state lines to live with the child's parent.  In analyzing this question, the Arizona court first observed that, "[b]y adopting the [compact], enacting [the enabling legislation], and delegating a representative of this state to participate in the activities of the [interstate commission charged with administering the compact], Arizona has implicitly agreed to accept and abide by rules or regulations duly promulgated by the [commission]."  *Id.* at 518.  The court then went on to examine whether the commission's interpretation of the compact was *ultra vires*, and found to the contrary (disagreeing with *McComb*).  *Id.* at 519–22.

Amica naturally emphasizes *Leonardo*'s language about the duty to abide by an interstate commission's rules and regulations.  And in the context of the Insurance Compact, the words of *Leonardo* could likely be said of Colorado: Colorado has adopted the Insurance Compact through enabling legislation and a Colorado representative has been designated to participate in the Interstate Commission's activities, so Colorado must likewise accept the Interstate Commission's rules and regulations.  But there are two important distinctions.

The first distinction is that *Leonardo* was not analyzing whether an interstate

commission's regulation can supersede a conflicting state law. The question, rather, was whether the interstate compact applied at all, given that the interstate child custody transfer was to the child's parent and the Interstate Compact on the Placement of Children does not obviously apply to such transfers. In that context, the Arizona court examined whether the interstate commission's relevant regulation was consistent with the compact.

The second distinction is even more important, as it gets to the heart of the problem. Amica's proffered case law, including *Leonardo*, shows that Amica believes the primary question presented here is the status of interstate compacts vis-à-vis other sources of state law. But that question is actually secondary. Wertz has raised a larger question which must be answered first: whether the Colorado Constitution allows the Colorado Legislature to adopt the *kind* of compact at issue here. If the answer is "no," then it does not matter that the Colorado Legislature enacted the Insurance Compact and can participate in the Interstate Commission's proceedings, and thereby should be bound by the Interstate Commission's rules and regulations—because the Insurance Compact would be a nullity in Colorado.

9.    Other Considerations

If the Colorado Legislature may validly subordinate Colorado's statutes to regulations promulgated by an interstate commission, some eyebrow-raising scenarios immediately come to mind. Could Colorado, for example, join an interstate uniform criminal law compact that delegated to an interstate commission the authority to decide

what crimes should be punished and what those punishments should be, notwithstanding state statutes that might conflict?  Or, perhaps less ominously, could the Colorado Legislature dispense with keeping track of proposed changes to the Uniform Commercial Code and instead simply join an interstate commercial law compact whose administrators have power to establish the applicable standards by regulation?  More generally, if the structure of the Insurance Compact is consistent with separation-of-powers principles as they are generally understood in American jurisprudence, then why have American lawmakers spent the last century attempting to achieve uniformity on state-law matters through the cumbersome process of drafting model legislation and then lobbying for its approval in the various states' legislatures?

Framed in these terms, one might conclude intuitively that the structure of the Compact is impermissible.  But this case is not about an interstate criminal or commercial law commission, and, in the specific context of the Insurance Compact, reasonable counterarguments exist—especially considering the Colorado Supreme Court's generally pragmatic approach to matters of administrative law.  For example, when judging whether the Colorado Legislature has validly delegated authority to a Colorado administrative agency, the Colorado Supreme Court has long accepted the "modern view" that "the proper focus should be upon the totality of protection provided by standards and procedural safeguards at both the statutory and administrative levels." *Cottrell*, 636 P.2d at 709.  It is not difficult to imagine the Colorado Supreme Court applying analogous reasoning—or pragmatism more generally—to the Insurance

Compact.  In that light, the Court notes the following arguments potentially in favor of the Compact.

First, it is obvious from the structure and stated purposes of the Compact that the Interstate Commission will promulgate Uniform Standards that conflict with some member states' existing statutes.  In other words, given the Compact's primary goal of uniformity, conflict with existing statutes is to be expected.  One might even say that conflict is *invited* by any state legislature choosing to ratify the Compact, so that the desired uniformity will result.  And if invited, the Compact might be viewed as a legislature's pre-approval of any conflict, functionally equivalent to the legislature's choice to repeal any conflicting statute to the extent of the conflict.  Moreover, the Colorado Legislature appointed a Colorado state official (the insurance commissioner) to participate in the process of making those potentially conflicting standards.  Perhaps this is enough under the Colorado Constitution to justify the Insurance Compact.

Second, the Insurance Compact's promulgation procedures may be highly relevant.  The Insurance Compact requires the Colorado Legislature to receive notice of a proposed Uniform Standard before it becomes enforceable, and the Colorado Legislature may opt out of that Standard at any time, both before and after it goes into effect.  Colorado's insurance commissioner can do the same by regulation.  This could be analogized to similar arrangements that have been deemed permissible in other jurisdictions, such as under the federal Rules Enabling Act, where amendments to the federal rules of court are submitted to Congress by May 1 and become effective on

December 1 if Congress fails to reject them.  *See* 28 U.S.C. § 2074(a).[7]  Perhaps the

Colorado Legislature's continuing ability to opt out of any Uniform Standard is the

functional equivalent of legislative consent to any standard that conflicts with an existing

statute (although this would not account for the Governor's constitutional role in

choosing whether to sign or veto legislation, *see* Colo. Const. art. IV, § 11).

Third, the Insurance Compact can be seen as establishing a statutory choice-of-

law rule.  In this view, Colorado and the Interstate Commission are viewed as different

legal jurisdictions.  Through the Insurance Compact, the Colorado Legislature has

directed Colorado courts to apply "Interstate Commission law" to insurance policies that

are "enforceable in the Interstate Commission," so to speak.

If any of these arguments in favor of the Insurance Compact is correct, it

nonetheless means that the Colorado Legislature may delegate an amount of authority

to an interstate administrative agency that it could not delegate to a Colorado

administrative agency.  Thus, none of these possibilities necessarily sidesteps the

serious separation-of-powers question presented under the Colorado Constitution—and

a decision either way could have significant long-term consequences, either by

expanding or contracting the Colorado Legislature's power to enter into interstate

compacts and to delegate administrative authority.  Furthermore, if the Colorado

Legislature may not lawfully delegate authority to the Interstate Commission, it could

---

[7] On the other hand, the Rules Enabling Act also creates a dichotomy between procedure and substance, and forbids rules that "abridge, enlarge or modify any substantive right."  *Id.* § 2072(b).

call into question the Insurance Compact's viability more broadly.  In the Court's experience, the states are more-or-less uniform on the question of how much power the legislature may delegate to an administrative agency.  Any ruling on how these principles might apply to the Insurance Compact in Colorado would likely have a much broader effect than in Colorado alone.

Given all of this, the question is ill-suited for a federal court sitting in diversity, whose decision would be binding only in this case.  The Court will therefore *sua sponte* certify the question to the Colorado Supreme Court.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Amica's Motion for Summary Judgment (ECF No. 67) is GRANTED as to the question of whether the ITLIP Standards were properly promulgated, and as to Wertz's equal protection and special legislation theories, but is otherwise DENIED WITHOUT PREJUDICE;

2. Pursuant to Colorado Appellate Rule 21.1, the Court CERTIFIES the following question to the Colorado Supreme Court:

> Does the Colorado Constitution empower the Colorado Legislature to enter into the Interstate Insurance Product Regulation Compact, Colo. Rev. Stat. § 24-60-3001, considering that: (a) the Compact will not be approved by the United States Congress; (b) the Compact creates an administrative body with power to promulgate rules and regulations with the force of law in Colorado; and (c) such rules and regulations supersede any Colorado statute to the extent of a conflict between the rule or regulation and the Colorado statute?

3.  Pursuant to Colorado Appellate Rule 21.1(d), the Clerk shall forward this Order to the Colorado Supreme Court under the Clerk's official seal, and the Clerk shall, if and when requested by the Colorado Supreme Court, forward any portion of the record which the Colorado Supreme Court may request; and

4.  All deadlines that may be outstanding in this action are VACATED; and

5.  Pursuant to D.C.COLO.LCivR 41.2, this case is ADMINISTRATIVELY CLOSED subject to re-opening for good cause shown, including upon the Colorado Supreme Court's disposition either by refusing to accept the certified question or by accepting the question and issuing a final opinion on the merits.

Dated this 11th day of September, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge