**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-1161-WJM-CBS

AMICA LIFE INSURANCE COMPANY,

     Plaintiff,

v.

MICHAEL P. WERTZ,

     Defendant.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND TERMINATING CASE**

---

The case arises, sadly, from the suicide of a Colorado resident, Martin Fisher

("Fisher"), fourteen months after Plaintiff Amica Life Insurance Company ("Amica")

issued him a life insurance policy. The policy contains a two-year suicide exclusion,

which is lawful under a regulation promulgated by an administrative agency created by

an interstate compact to which Colorado is a party. A Colorado statute, however,

nullifies suicide exclusions longer than one year. *See* Colo. Rev. Stat. § 10-7-109. If

Colorado may validly delegate authority to an administrative agency to develop

insurance standards that may conflict with Colorado insurance statutes, then Amica's

two-year exclusion is valid. Otherwise, Amica's exclusion is invalid and Amica owes the

death benefit to Fisher's beneficiary, Defendant Michael P. Wertz ("Wertz"). Invoking

this Court's diversity jurisdiction,[1] Amica brought this lawsuit for declaratory judgment

---

[1] Amica is a Rhode Island corporation headquartered in Rhode Island, Wertz is a
Colorado resident, and the death benefit in question is $500,000. (ECF No. 1 ¶¶ 3, 4, 7.)

that it properly denied payment of Fisher's death benefit in light of the interstate two-year exclusion. Currently before the Court on Amica's motion for summary judgment. (ECF No. 67.)

The proper outcome ultimately turns on the extent of the Colorado Legislature's authority under the Colorado Constitution to delegate regulatory power to an administrative body. This Court therefore *sua sponte* certified the question to the Colorado Supreme Court per Colorado Appellate Rule 21.1. *See Amica Life Ins. Co. v. Wertz*, 272 F. Supp. 3d 1239, 1255 (D. Colo. 2017) (ECF No. 73) ("*Wertz*" or "Prior Order"). Precisely three weeks later, the Colorado Supreme Court declined to accept the certified question. (*See* ECF No. 75.) That court thus returned a weighty question of Colorado constitutional law to the undersigned, whose decisions, particularly regarding state law, bind no one but the parties before him.[2]

The Court then accepted supplemental briefs from the parties (ECF Nos. 81, 82, 86-1) as well as an *amicus* brief from the National Association of Insurance Commissioners ("NAIC") in support of Amica (ECF No. 79-1); an *amicus* brief from the Interstate Insurance Product Regulation Commission ("Interstate Commission" or "Commission"), also in support of Amica (ECF No. 80-1); and Wertz's response to these *amicus* briefs (ECF No. 85). The Court reviewed these briefs and called for limited further briefing on certain matters. (ECF No. 89.) All parties and *amici* filed briefs in response. (*See* ECF Nos. 90–93.)

The Court has thoroughly studied all of these materials, including the parties'

---

[2] *See Hernandez v. Ray Domenico Farms, Inc.*, 250 F. Supp. 3d 789, 801 (D. Colo. 2017) ("[a]lthough the judges of this District strive to respect each other's decisions, we do not bind each other"); *First Nat'l Bank in Fort Collins v. Rostek*, 514 P.2d 314, 316 n.1 (Colo. 1973) ("it [is] well settled that a state court is not bound by federal court interpretation of state law").

original summary judgment briefs (ECF Nos. 67, 70, 72), the legal authorities cited by the parties and *amici*, and what appears to be the only treatise on interstate compacts, *see* Michael L. Buenger et al., *The Evolving Law and Use of Interstate Compacts* (2d. ed. 2016) ("*Interstate Compacts*"). The Court concludes—to its surprise—that the Colorado Legislature may validly delegate to an administrative agency the power to promulgate a regulation that modifies a statute. Moreover, there is no barrier to the Colorado Legislature delegating such authority to an interstate administrative agency, so the two-year exclusion applicable to Fisher's policy is valid and Amica properly denied payment of the death benefit.

For ease of the seemingly inevitable appellate review, the explanation that follows is not confined to the legal question of what the Colorado Legislature may validly delegate to an administrative agency, but also repeats verbatim much of the Prior Order, including rulings regarding certain factual disputes. In other words, the purpose of this order is to address all matters resolved through the Prior Order and all matters left open there, so that one need only read this order to understand the full dispute and the Court's holdings.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. STATUTORY BACKGROUND

Understanding anything else in this case first requires understanding the Interstate Insurance Product Regulation Compact, which has been enacted by the Colorado Legislature at Colorado Revised Statutes § 24-60-3001 ("Insurance Compact" or "Compact"). Having enacted the Insurance Compact, Colorado participates with most of the other states in the Union in an arrangement intended "[t]o develop uniform standards" for "individual and group annuity, life insurance, disability income and long-term [care] insurance products." *Id.*, art. I, §§ 1, 2; *see also id.*, art. II, § 11.[3]

The Compact creates the Interstate Commission, "a joint public agency" to which each compacting state may send one representative. *Id.*, art. III, § 1; art. V, § 1(a). The Commission is empowered to promulgate "Uniform Standards" for insurance products "which shall have the force and effect of law and shall be binding in the Compacting States." *Id.*, art. II, § 15; art. IV, § 1; art. VII, § 1. Insurance companies may then

---

[3] According to the Compact's website (www.insurancecompact.org, last visited Oct. 4, 2018), all states have joined save for California, Delaware, Florida, New York, North Dakota, and South Dakota.

submit insurance products to the Interstate Commission for approval under the Uniform Standards, and such approval authorizes the insurance company to sell that product in any Compact member state in which the company is otherwise authorized to do business. *Id.*, art. X, §§ 1, 3. In short, the Interstate Commission acts as a near-national insurance commissioner with respect to "individual and group annuity, life insurance, disability income, and long-term [care] insurance products." *Id.*, art. I, § 1.

In promulgating Uniform Standards, the Insurance Compact requires the Interstate Commission to follow "a rulemaking process that conforms to the Model State Administrative Procedure Act of 1981 as amended, as may be appropriate to the operations of the Commission." *Id.*, art. VII, § 2. Moreover, "[b]efore the Commission adopts a Uniform Standard, the Commission shall give written notice to the relevant state legislative committee(s) in each Compacting State responsible for insurance issues of its intention to adopt the Uniform Standard." *Id.* Uniform Standards become effective ninety days after promulgation "or such later date as the Commission may determine." *Id.*, art. VII, § 3.

Any member state of the Compact may opt out of a Uniform Standard "either by legislation or regulation duly promulgated by the Insurance Department under the Compacting State's Administrative Procedure Act." *Id.*, art. VII, § 4. If a state opts out after a Uniform Standard has gone into effect, the opt out is prospective only. *Id.*, art. VII, § 5.

"[I]n the event the Commission exercises its rulemaking authority in a manner that is beyond the scope of the purposes of this [Compact], or the powers granted hereunder, then such an action by the Commission shall be invalid and have no force

and effect." *Id.*, art. VII, § 1.  But, if "any person" wishes to challenge a Uniform Standard, that person must file such a challenge within thirty days of the Uniform Standard's promulgation.  *Id.*, art. VII, § 7.  In reviewing the challenge, "[t]he court shall give deference to the actions of the Commission consistent with applicable law and shall not find the Rule[4] or Operating Procedure to be unlawful if the Rule or Operating Procedure represents a reasonable exercise of the Commission's authority."  *Id.*

### III. FACTS

The following facts are undisputed unless attributed to one party or another, or otherwise noted.

### A.     The Two-Year Suicide Exclusion Standard

Colorado enacted the Insurance Compact in 2004, with an effective date of August 4, 2005.  (ECF No. 67 at 3, ¶ 1.)[5]  The Colorado Legislature designated the state insurance commissioner as Colorado's representative at the Interstate Commission.  Colo. Rev. Stat. § 24-60-3001, Preamble.  The Interstate Commission itself became operational in June 2006.  (ECF No. 67 at 4, ¶ 4.)

On January 24, 2007, the Commission published notice of its intent to adopt its Individual Term Life Insurance Product ("ITLIP") Standards.  (*Id.* at 6, ¶ 18.)  Amica claims that, on May 1, 2007, the Commission provided notice of the pending ITLIP Standards to "the chairs, ranking members, and members of the Colorado General Assembly's (i) House Business Affairs and Labor Committee and (ii) Senate Business Labor and Technology Committee."  (*Id.* ¶ 21.)  Wertz denies this.  (ECF No. 70 at 3,

---

[4] "Rule" is defined to include any Uniform Standard.  *Id.*, art. II, § 12.

[5] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

6

¶ 21.)  The Court will address whether Wertz's denial creates a genuine issue of material fact in Part V.B, below.  Regardless, the parties agree that the House and Senate committees named above were the proper committees to which the Interstate Commission was required to provide notice.  (ECF No. 67 at 6, ¶ 23.)

The Interstate Commission held a public hearing regarding the ITLIP Standards on May 16, 2007.  (*Id.* at 7, ¶ 24.)  That is also the date of the last written comment the Commission received regarding the ITLIP Standards.  (*Id.* ¶ 27.)

The ITLIP Standards were formally adopted by the Interstate Commission on June 1, 2007, with a declared effective date of September 6, 2007.  (*Id.* ¶ 31.)  The ITLIP Standards declare that any suicide exclusion in an approved policy must be no longer than two years from the date the policy is issued.  (*Id.* ¶ 32.)  Colorado has never opted out of that Uniform Standard—or, for that matter, any Uniform Standard.  (*Id.* at 13, ¶¶ 83–84.)

## B.    Fisher's Policy, His Suicide, and Wertz's Claim

In October 2011, the Interstate Commission approved an individual term life insurance product submitted by Amica.  (*Id.* at 10, ¶ 55.)  That product, as approved, excluded death benefits if death of the insured was caused by suicide within two years from the policy's issuance.  (*Id.* ¶ 57.)  In such a circumstance, Amica's only obligation was to refund the policy premium.  (*Id.*)

On January 28, 2014, Amica issued to Fisher one of the aforementioned life insurance policies.  (*Id.* ¶ 58.)  Fisher committed suicide about fourteen months later, on March 12, 2015.  (*Id.* at 11, ¶ 71.)  On May 1, 2015, Defendant Wertz, who was Fisher's named beneficiary under the policy, submitted a claim for the death benefit, citing Colorado Revised Statute § 10-7-109.  (*Id.* at 12, ¶ 72.)  That section reads in relevant

part as follows: "The suicide of a policyholder after the first policy year of any life insurance policy issued by any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy . . . ."[6]  In other words, Wertz believed Colorado's one-year exclusion applied, not the policy's Commission-approved two-year exclusion.  Amica stood by the two-year exclusion, denied Wertz's claim, and refunded the premium.  (*Id.* ¶ 73.)

## IV.  PROCEDURAL HISTORY

Anticipating that Wertz would file suit, Amica filed a declaratory judgment action in this Court in June 2015.  (ECF No. 1.)  Wertz answered and affirmatively defended that the two-year suicide exclusion violated Colorado law and must be declared unenforceable.  (ECF No. 24 at 4, ¶ 20.)  Wertz also counterclaimed for reformation of the policy, breach of contract, and common-law bad faith breach of insurance contract. (*Id.* at 9–12.)

At first, the parties agreed "the material facts of this matter were not in dispute" (ECF No. 39 ¶ 2) and the resolution "depended entirely upon a question of law" (ECF No. 45 at 1), namely, which source of authority controls: Colorado Revised Statute § 10-7-109 or the ITLIP Standards?  Amica therefore filed what was, in effect, a motion for

---

[6] Although the statute is framed in terms of prohibiting a defense, courts have long held that it establishes a substantive standard for life insurance contracts in Colorado.  *See Aetna Life Ins. Co. v. Braukman*, 70 F.2d 647, 651 (10th Cir. 1934) ("The statute becomes a constitutent part of the contract . . . ."); *McCowan v. Equitable Life Assur. Soc'y*, 179 P.2d 275, 277 (Colo. 1947) ("The suicide provision of the policy was a nullity, and was void and of no effect at the time it was written.  The inhibition of the statute, in legal contemplation, was substituted for the void provision and became binding upon the parties."); *Mass. Protective Ass'n v. Daugherty*, 288 P. 888, 889 (Colo. 1930) ("any provision in a policy attempting to relieve an insurer from liability in case of suicide is a nullity [if contrary to the one-year exclusion statute]"); *see also Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 100 (Colo. 1995) ("Insurance policy clauses that are contrary to a provision of a statute are void as against public policy.").

judgment on the pleadings to resolve the question of law.  (ECF No. 25; *see also* ECF No. 49 at 3 n.1.)  Amica naturally argued that Colorado had enacted the Insurance Compact and, in so doing, declared that the Interstate Commission's duly promulgated Uniform Standards have the force and effect of law; therefore, the ITLIP Standards apply.  Wertz's primary response was that the Compact, or at least its application in this case, violates the Colorado Constitution.  Specifically, Wertz argued that the Compact is an unconstitutional delegation of legislative power, violates separation-of-powers principles, and violates the guarantees of equal protection and freedom from special legislation.  (ECF No. 30-1 at 3–18.)

In reply, Amica relied heavily on the Compact's opt-out provisions.  (ECF No. 33 at 5–6.)  Amica characterized the ability to opt out as "the ultimate safeguard against the exercise of unbridled discretion by the Commission" (ECF No. 33 at 5), thus mollifying the Colorado Supreme Court's charge that "individuals be protected against the unnecessary and uncontrolled exercise of . . . discretionary power" by bodies to whom legislators have delegated rulemaking authority.  *Cottrell v. City & Cnty. of Denver*, 636 P.2d 703, 709 (Colo. 1981).

Two months after Amica filed its reply, and before this Court had decided Amica's motion, Wertz filed a motion to amend his answer and counterclaims.  (ECF No. 39.)  Wertz there claimed "ongoing investigation and research under further inquiry" which has led him to "believe[] that the Commission failed to promulgate the [ITLIP Standards] in accordance with the Compact's terms."  (*Id.* ¶ 2.)  Therefore, according to Wertz, the ITLIP Standards might be invalid under the Compact's own terms.  Wertz claimed that this would "impact the constitutionality of the Compact statute."  (ECF No.

39 ¶ 2.) Another implication, of course, would be that this Court might not need to reach the constitutional questions, should Wertz turn out to be correct.

The Court resolved Amica's and Wertz's respective motions by denying the former without prejudice and granting the latter. (ECF No. 49.) The Court reasoned that "the constitutionality of the Compact is a weighty issue that this Court should avoid if there is a colorable possibility that the case can be decided on other grounds, such as the potential procedural irregularity that Wertz raises." (*Id.* at 7.) The Court therefore sent the parties to discovery on the question of "the procedural regularity of the [ITLIP] Standards." (*Id.* at 8.)

That discovery is now closed, and Amica has filed its motion for summary judgment, claiming no genuine dispute of material fact on the procedural regularity of the ITLIP Standards, and renewing its argument that those Standards control over Colorado Revised Statute § 10-7-109. (ECF No. 67.)[7]

## V. ANALYSIS OF FACTUAL DISPUTES

### A. Timeliness of Wertz's Challenge

The Insurance Compact requires that any action seeking judicial review of a Uniform Standard be brought within thirty days of promulgation. Colo. Rev. Stat. § 24-60-3001, art. VII, § 7. The ITLIP Standards were promulgated on June 1, 2007. Wertz raised his current counterclaim theory—*i.e.*, that the Interstate Commission did not give proper pre-promulgation notice of the ITLIP Standards to the Colorado Legislature—for

---

[7] Amica also moved on Wertz's equal protection and special legislation theories. (ECF No. 67 at 30–33.) Wertz did not respond to these arguments, and is therefore deemed to have abandoned them. *See, e.g.*, *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 933 (10th Cir. 2015); *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001); *Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009).

the first time on January 21, 2016.  (ECF No. 39.)  Amica accordingly argues that "any procedural challenge" to the ITLIP Standards is now foreclosed as untimely.  (ECF No. 67 at 24.)

There are colorable counterarguments to this position.  For example, is a challenge in the context of a dispute between insurer and beneficiary the same as "judicial review" under the Insurance Compact (which presumably has in mind an action against the Interstate Commission directly)?  Or, may the Colorado Legislature, consistent with due process, create a statute of limitations as short as thirty days?  But Wertz does not raise these arguments.  In fact, he entirely ignores Amica's timeliness argument.  The Court therefore deems him to have conceded that his challenge to the procedural regularity of the ITLIP Standards is untimely.

**B.     Lack of a Genuine Dispute of Material Fact**

Alternatively, the Court finds that there is no genuine dispute of material fact over whether the Interstate Commission provided proper pre-promulgation notice of the ITLIP Standards to the Colorado Legislature.

The sole relevant factual dispute—genuine or otherwise—is whether the Interstate Commission actually *sent* notice of the ITLIP Standards to the Colorado Legislature ahead of those Standards' promulgation.  Amica offers the affidavit of Karen Schutter, the Interstate Commission's executive director.  (ECF No. 67-1 at 1, ¶ 1.) Schutter claims to be an authorized records custodian for the Commission.  (*Id.* at 2, ¶ 6.)  Schutter says that the requisite notice to the Colorado Legislature was sent on May 1, 2007 (*id.* ¶ 14), which obviously predates the ITLIP Standards' promulgation on June 1, 2007.  Schutter attaches to her affidavit a document ("Exhibit D") that appears to be a sort of cover letter, directed to all relevant state legislative committees and

announcing the Interstate Commission's consideration of the ITLIP Standards, among others.  (ECF No. 67-1 at 31.)  Schutter does not claim that Exhibit D was the notice itself, but rather describes it as the "content of the notice" sent to the Colorado Legislature.  (*Id.* at 6, ¶ 14.)

Wertz's response is essentially twofold.  First, Wertz points out that the Interstate Commission, in response to his records request, stated that the May 2007 notice to state legislatures has already been destroyed pursuant to the Commission's five-year records retention schedule.  (ECF No. 70 at 3, ¶ 21.)  Thus, he attacks Exhibit D— although, surprisingly, *not* on authenticity grounds.  He does not, for example, dispute that Exhibit D embodied the "content of the notice."  He instead simply asserts,

> Exhibit D to the Schutter Affidavit does not establish that the Commission sent the requisite Legislative Notice on May 1, 2007, or any other time prior to adopting the ITLIP Standards.  Nor does Exhibit D establish that the Commission sent the requisite Legislative Notice to the proper members of the Colorado General Assembly.

(*Id.*; *see also id.* at 20 (repeating the same arguments).)  Second, Wertz notes that Schutter began her employment with the Interstate Commission in December 2008, after the May 2007 notice was allegedly sent, and therefore she lacks personal knowledge regarding that matter.  (*Id.* at 3, ¶ 21.)

Wertz's arguments are somewhat misdirected.  In Colorado, administrative action is entitled to a presumption of regularity.  *Marshall v. Civil Serv. Comm'n*, 401 P.3d 96, 101 (Colo. App. 2016), *cert. denied sub nom. Marshall v. City & Cnty. of Denver*, No. 16SC905, 2017 WL 3594017 (Colo. Aug. 21, 2017).  If Wertz had brought a timely judicial review challenge directly against the Interstate Commission, Wertz would have borne the burden to rebut the presumption of regularity.  *Id.*; *see also* 3 Charles H.

Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 9:13 (3d ed., Feb. 2017 update).  Wertz offers no reason why he does not bear the same burden as to his counterclaim against Amica based on the alleged irregularity of the ITLIP Standards, nor does the Court independently discern any reason.[8]  The Court holds, therefore, that the burden of proof rests on Wertz, just as it would in a normal action for judicial review.

In that light, it was Wertz's burden in his summary judgment response brief to present the evidence by which a reasonable jury could conclude that the May 2007 legislative notice was never sent.  Viewing Wertz's response generously, it appears he proffers only two items of evidence: (1) the Interstate Commission's admission that it no longer possesses the actual May 2007 notice; and (2) the fact that the Commission was able to produce legislative notices sent in 2008 and 2010, both of which also should have been destroyed under the Commission's five-year retention schedule (*see* ECF No. 70 at 19 n.1)—apparently insinuating that the retention schedule explanation as to the May 2007 notice is suspect.

The Court holds that these two items, viewed together and in the light most favorable to Wertz, are no more than a scintilla of evidence that the Interstate Commission failed to provide pre-promulgation notice of the ITLIP Standards to the Colorado Legislature on May 1, 2007.  In other words, no reasonable jury could find that Wertz carried his burden on this question.  Accordingly, there is no *genuine* dispute of material fact as to pre-promulgation notice.

## C.     The "Consider Fully" Clause

Wertz also advances a rather creative alternative argument that the ITLIP

---

[8] Indeed, Wertz's response brief is devoid of any recognition that a question of burden might exist.

Standards were invalidly promulgated. His argument is grounded in the following two sentences of the Insurance Compact:

> Before the Commission adopts a Uniform Standard, the Commission shall give written notice to the relevant state legislative committee(s) in each Compacting State responsible for insurance issues of its intention to adopt the Uniform Standard. The Commission in adopting a Uniform Standard shall consider fully all submitted materials and issue a concise explanation of its decision.

Colo. Rev. Stat. § 24-60-3001, art. VII, § 2. Wertz interprets the second sentence to mean that the Interstate Commission must "'consider fully' all materials submitted in response" to the notice given in the first sentence. (ECF No. 70 at 20.) Therefore, he says, "[n]otice must be sent in a timeframe that allows sufficient time for the legislature to react and respond." (*Id.*) But, he continues, the notice was allegedly sent on May 1, 2007, and the Colorado Legislature's 2007 session ended on May 4, 2007. (*Id.*) Thus, the Commission supposedly violated its "consider fully" duty by not giving the Colorado Legislature time to submit any response or comment.

Wertz's interpretation simply has no support in the statutory language. The second sentence quoted above speaks of the rulemaking process generally. It has nothing to do with waiting for a particular legislature to submit written materials. This argument therefore fails as a matter of law.

## VI. ANALYSIS OF LEGAL DISPUTES

### A. Matters Not in Question

Given the foregoing, the constitutional question cannot be avoided. In approaching that question, the Court first notes the following.

Despite the many arguments made by the parties and *amici*, this case is *not* about:

- Whether the Colorado Legislature may delegate rulemaking authority to an administrative agency. Without question, it may.

- Whether the Colorado Legislature may delegate rulemaking authority to an *interstate* administrative agency created by compact. Again, it may.

- Whether the ITLIP two-year suicide exclusion is consistent with the authority delegated to the Interstate Commission. Momentarily setting aside the question of conflict with a pre-existing state statute, the Court has been given no reason to doubt that the Interstate Commission's delegated authority permits it to establish a two-year suicide exclusion as part of its Uniform Standards.

- Whether the ITLIP two-year suicide exclusion is a good idea or bad idea as compared to a different time limit, such as Colorado's statutory one-year limit.

The *only* question before the Court is whether the Colorado Legislature may delegate to an interstate authority the discretion to promulgate regulations that, in effect, amend or repeal state statutes.

**B.      Framing the Dispute**

The Court's inquiry may be broken down into two sub-questions. ***First***, may the Colorado Legislature delegate to a *Colorado* administrative agency the discretion to promulgate regulations that substantively modify state statutes? If so, the Court's judgment must be for Amica because no party has advanced any reason why the Colorado Legislature cannot delegate to an interstate agency the same authority it could delegate to a Colorado agency. But if not, then, ***second***, does the power to enter into

interstate compacts nonetheless give the Colorado Legislature authority to delegate administrative rulemaking power to an interstate agency that it could not delegate to a Colorado agency?

The Court ultimately concludes that the answer to the first question is "yes." However, the parties and *amici* have spent the bulk of this case arguing over the second question. Even when the Court solicited supplemental briefs specifically regarding the first question (*see* ECF No. 89), *amici* responded by insisting that the first question is irrelevant—indeed, an entirely mistaken inquiry—and so the Court should focus solely on the second question (*see* ECF Nos. 91, 92). Amica has similarly argued that the first question is unnecessary to resolve because, in its view, the answer to the second question is obviously "yes." (*See* ECF No. 72 at 4–5; ECF No. 81 at 3 n.1.) Accordingly, the Court will first explain why it believes the answer to the second question is "no." The Court will then explain why the answer to the first question is "yes."

## C.    May the Colorado Legislature Delegate Rulemaking Authority to an Interstate Administrative Agency that it Could Not Delegate to a Colorado Administrative Agency?

Article III of the Colorado Constitution reads,

> The powers of the government of this state are divided into three distinct departments,—the Legislative, Executive and Judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this Constitution expressly directed or permitted.

Article III is sometimes interpreted to mean that "[o]nly the legislature has the power to amend laws," *Miller Int'l, Inc. v. Colo. Dep't of Revenue*, 646 P.2d 341, 345 (Colo. 1982), so "a regulation must further the will of the legislature and may not modify or

contravene an existing statute," *id.* at 344. "[A]ny regulation which is inconsistent with or contrary to a statute is void and of no effect." *Id.*

These pronouncements are not as absolute as they sound—a matter the Court will address below in Part VI.D. For present purposes, the Court will take them at face value. Even taking them at face value, however, Amica and *amici* argue that interstate compacts operate in a different legal dimension, where things of legal significance can happen that normally cannot happen, such as where a legal authority normally deemed subordinate to a constitution or statute nonetheless takes precedence. Indeed, particularly under *amici*'s argument, a state's power to enter interstate compacts frees it entirely from relevant state constitutional restraints, giving it power to achieve *any* goal via an interstate compact as long as it does not violate federal law. (*See, e.g.*, ECF No. 67 at 21–24.)

As the Court will explain below, Amica's and *amici*'s authorities do not demonstrate that interstate compacts function outside the normal channels of legal authority and constitutional review. Rather, these authorities show that *if* Congress has *approved* an interstate compact, then the compact is deemed to be federal legislation and overrides any conflicting state authority by virtue of the Supremacy Clause. *See* U.S. Const. art. VI, ¶ 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."). The Insurance Compact is not congressionally approved, and likely need not be, given that Congress has specifically declared

17

insurance to be a matter primarily of state, not federal, concern.  *See* 15 U.S.C. § 1012. As to compacts that do not receive congressional approval, such as the Insurance Compact, the case law shows that they are treated as contracts between the states. This may limit the sorts of arguments one compacting state may assert vis-à-vis another compacting state, but it does not prevent a citizen aggrieved by a particular compact from challenging the state's authority under the state constitution to enter into the compact.

The Court summarizes the relevant authorities chronologically.

1.    *Green* (U.S. 1823)

Amica cites *Green v. Biddle*, 21 U.S. 1 (1823), which involved a dispute over Virginia land titles granted in what later became the State of Kentucky.  When Kentucky became a state, it entered into a compact with Virginia that all legal interests in land established under Virginia law before Kentucky existed must be preserved.  *Id.* at 3. Kentucky included the terms of that compact in its first state constitution.  *Id.* at 3–4.  A later Kentucky statute threatened this arrangement, however, thus prompting the lawsuit that eventually reached the Supreme Court.  The Supreme Court held that the compact between Virginia and Kentucky was a contract and that Kentucky "was incompetent to violate that contract, by passing any law which rendered those rights less valid and secure."  *Id.* at 92–93.

*Green* shows only that, once a state has bound itself by an interstate compact, it cannot pass legislation contradicting the compact.  It does not inform the question of whether a state constitution permits a state legislature in the first instance to enter into a compact with a particular structure.

2.     *Hinderlider* (U.S. 1938)

Amica cites *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92 (1938).  This case involved the La Plata River Compact, adopted by Colorado and New Mexico (and approved by Congress) in the early 1920s to facilitate equitable apportionment of La Plata River waters between the two states.[9]  The compact generally provides that, from February 15 to December 1 of each year, Colorado must allow half of the river's water to cross into New Mexico.  *Id.* at 96–97.  However, if the two states' respective state engineers agree that the river is particularly low and that it would be more efficient to alternate between all of the water going to Colorado for a certain number of days and then all of the water going to New Mexico for an equal number of days, the compact permits such alternation.  *Id.* at 97.

The summer of 1928 was particularly dry and the Colorado and New Mexico state engineers invoked the alternation procedure.  *Id.*  One Colorado ditch company, deprived of the water flow it otherwise would have received, filed suit, claiming that the compact could not interfere with vested private water appropriation rights.  *Id.* at 98–99. The United States Supreme Court rejected this reasoning, in part because states have a federal common law duty to equitably apportion between themselves the water of shared rivers, and that duty supersedes whatever rights may be vested under state law. *Id.* at 101–03.

*Hinderlider* is thus inapposite.  It involved state executive officers exercising their discretion to do something specifically contemplated in the compact (alternating water flow, rather than permitting half of the river to pass into New Mexico), and it further

---

[9] The La Plata River Compact is currently codified at Colo. Rev. Stat. § 37-63-101.

involved supervening federal common law.  It did not involve an interstate commission's exercise of rulemaking authority to establish a standard that contradicts an existing state statute.

### 3. *Dyer* (U.S. 1951)

Since returning from the Colorado Supreme Court, Amica and *amici* have particularly emphasized *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22 (1951) ("*Dyer*"). *Dyer*, they say, shows that congressional approval—although present in that dispute—is immaterial to determining a state's powers via interstate compact.  (*See* ECF No. 79-1 at 16–17; ECF No. 80-1 at 3–4; ECF No. 81 at 3–5.)

In *Dyer*, eight states, including West Virginia, entered the Ohio River Valley Water Sanitation Compact, which Congress approved.  *Id.* at 24–25.  That compact established an administrative commission governed by three representatives of each compacting state and three representatives from the federal government.  *Id.* at 24.

A dispute then arose in West Virginia over whether its state constitution would permit it to participate in that compact as designed.  Specifically, the state legislature appropriated money to support the administrative commission, but the state treasurer refused to issue the warrant necessary to release the funds.  *Id.* at 25.  The West Virginia Supreme Court of Appeals upheld the auditor's refusal, holding that the West Virginia legislature did not have power under the state constitution to (1) bind itself, in perpetuity, to make appropriations of the kind required under the compact, or (2) delegate a portion of the state's police power to a body outside the state, such as the commission established by the compact.  *See* 58 S.E.2d 766, 775–77 (W. Va. 1950).  The United States Supreme Court then granted certiorari.

The Supreme Court understood that it was in the precarious position of reviewing

whether West Virginia's highest court properly interpreted West Virginia's constitution. Indeed, the Supreme Court acknowledged that the West Virginia court was usually "the ultimate tribunal in construing the meaning of [the West Virginia] Constitution." 341 U.S. at 28. The Supreme Court (per Justice Frankfurter) therefore devoted a substantial portion of its opinion to justifying its ability to contravene the West Virginia court's interpretation of its own constitution. *Id.* at 26–30. The Supreme Court reasoned that it was "free to examine determinations of [state] law by State courts in the limited field where a compact brings in issue the rights of other States and the United States." *Id.* at 28. Those rights flowed not just from the *fact* of a federally approved interstate compact, but also from the *subject* of the interstate compact: "Adjudication here of conflicting State interests affecting stream pollution does not rest upon the law of a particular State. This Court decides such controversies [through its original jurisdiction over 'controversies between two or more states,' U.S. Const. art III, § 2]." *Id.* at 26–27.

Having established its authority to review a West Virginia court's interpretation of West Virginia's constitution, the Supreme Court then turned to the question of the West Virginia Legislature's ability to delegate police powers. It began its analysis by announcing that a legislature's ability to "delegate to an administrative body the power to make rules and decide particular cases is one of the axioms of modern government." *Id.* at 30. As for the West Virginia court's concern about delegating "to a body outside the State [from which] its Legislature may not be free, at any time, to withdraw the power delegated," the Supreme Court simply announced that this was not a question of state law:

> We are not here concerned, and so need not deal, with
> specific language in a State constitution requiring that the

> State settle its problems with other States without delegating
> power to an interstate agency. What is involved is the
> conventional grant of legislative power. We find nothing in
> that to indicate that West Virginia may not solve a problem
> such as the control of river pollution by compact and by the
> delegation, if such it be, necessary to effectuate such
> solution by compact.

*Id.* at 30–31. In isolation, this language appears to be saying that "legislative power" is

an immutable supra-constitutional concept that inherently includes the power to

delegate, even if the relevant state constitution says otherwise. But the Supreme Court

immediately backed away from such implications by couching its statement in the fact

that *interstate waters* were at issue, thus implicating the court's original jurisdiction:

> If this Court, in the exercise of its original jurisdiction, were to
> enter a decree requiring West Virginia to abate pollution of
> interstate streams, that decree would bind the State. The
> West Virginia Legislature would have no part in determining
> the State's obligation. The State Legislature could not alter
> it; it could not disregard it . . . . The obligation would be fixed
> by this Court on the basis of a master's report. Here, the
> State has bound itself to control pollution by the more
> effective means of an agreement with other States. The
> Compact involves a reasonable and carefully limited
> delegation of power to an interstate agency. Nothing in its
> Constitution suggests that, in dealing with the problem dealt
> with by the Compact, West Virginia must wait for the answer
> to be dictated by this Court after harassing and
> unsatisfactory litigation.

*Id.* at 31. The court reasoned, in other words, that a state has constitutional power to do

whatever the United States Supreme Court may order it to do, and if it chooses to act

before being ordered to act, so much the better.

This highly pragmatic reasoning, so characteristic of Justice Frankfurter, is not

really an analysis of West Virginia's constitution. It is, instead, a commentary on the

practical implications of the U.S. Supreme Court's original jurisdiction over controversies

between two or more states. Because states must obey Supreme Court orders, states

must have *power* to obey, regardless of the terms of their respective constitutions.  By extension, the Supreme Court reasoned, states have *the same power* to settle interstate controversies without litigation.

Finally, as for the West Virginia court's interpretation of state constitutional restrictions on the legislature's ability to bind itself to future appropriations, the Supreme Court announced that the compact in question was "drawn with great care" to avoid that sort of state constitutional problem.  *Id.* at 32.  Thus, the Supreme Court simply disagreed with the West Virginia court's interpretation of the compact's effect under West Virginia constitutional law.  *Id.*

This reasoning did not sit well with the entire court.  Justice Black concurred in the result only, without opinion.  341 U.S. at 563.  Justice Reed concurred in the result and wrote separately, insisting that the federal Compact Clause, *see* U.S. Const., art. I, § 10, cl. 3 ("No state shall, without the consent of Congress, . . . enter into any agreement or compact with another state . . . ."), should be construed to mean that "[t]he interpretation of the meaning of [a federally approved] compact controls over a state's application of its own law through the Supremacy Clause and not by any implied federal power to construe state law."  341 U.S. at 33.

Perhaps no other justice signed on to Justice Reed's opinion because his proposal does not solve the problem.[10]  The question in *Dyer* was not interpretation of a compact but interpretation of a state constitution.  Justice Reed's reasoning only works if one assumes that the federal Compact Clause grants to the states the power to do

_____

[10] The majority characterized the approach endorsed by Justice Reed as an "inviting vista[]" but one that it need not survey because, it believed, it could resolve the case solely by reviewing the West Virginia court's application of West Virginia law.  *Id.* at 26.

things forbidden under their respective constitutions.  In other words, as long as a state legislature approves a compact that Congress also approves, the state constitution becomes irrelevant.  This, however, gives the legislature power to override the constitution that created it.  An aggrieved party's only hope would be to obtain a court order preventing the legislature from voting to accept the compact, or preventing the governor from signing it into law.  Without such an order, then adoption of the law would be the end of it.  The compact would become federal law superior to the state constitution.

Justice Jackson also concurred in the *Dyer* judgment, but his reasoning ultimately creates the same problem as Justice Reed's.  Justice Jackson said that West Virginia should simply be estopped from claiming a state constitutional infirmity:

> Estoppel is not often to be invoked against a government.  But West Virginia assumed a contractual obligation with equals by permission of another government that is sovereign in the field [*i.e.*, the federal government].  After Congress and sister States had been induced to alter their positions and bind themselves to terms of a covenant, West Virginia should be estopped from repudiating her act.  For this reason, I consider that whatever interpretation she may put on the generalities of her Constitution, she is bound by the Compact . . . .

*Id.* at 36.  If this were an appropriate application of estoppel, then once again a state legislature would have power to supersede its own constitution.  Advocates of a compact would need only to push it through the legislative process and secure the governor's signature.  The compact would then be immune to state constitutional challenges due to a type of apparent agency manifested to other compacting states and the federal government, thus justifying estoppel.

The foregoing analysis refutes Amica's and *amici*'s insistence that *Dyer*'s

reasoning was entirely independent from the fact that Congress approved the compact. To the contrary, everything about *Dyer* flowed from the fact of congressional approval, federal participation, the inherently interstate nature of adjusting the water rights at issue, and the Supreme Court's original jurisdiction over such disputes. None of those categories apply to the Insurance Compact. Most importantly, the subject of the Insurance Compact has nothing to do with an inherently interstate controversy or the Supreme Court's original jurisdiction, so *Dyer*'s most important doctrinal innovation—a state has power to do what the Supreme Court could order it to do in an original proceeding—has no application. *Dyer* is thus inapposite.

        4.    *Frontier Ditch* (Colo. 1988)

Amica cites *Frontier Ditch Co. v. Southeast Colorado Water Conservancy District*, 761 P.2d 1117 (Colo. 1988), which involved the Arkansas River Compact between Colorado and Kansas, *see* Colo. Rev. Stat. § 37-69-101. *Frontier Ditch* addressed a fairly unique situation, namely, "[t]he Frontier Canal, which since 1895 has been diverting water from the Arkansas River and its tributaries in Colorado for the irrigation of lands located entirely in Kansas." 761 P.2d at 1118. The negotiators of the Arkansas River Compact had "considerable discussion" on the question of how to address this particular canal, which defied tidy jurisdictional categorization. *Id.* The result was an agreement through which "'Colorado concede[d] to Kansas . . . exclusive administrative control over the operation of the Frontier Canal and its headworks . . . to the same extent as though said works were located entirely within the state of Kansas.'" *Id.* at 1119 (quoting Colo. Rev. Stat. § 37-69-101, art. VI(B)) (emphasis removed).

The Frontier Ditch Company filed suit in a Colorado water court "for the alleged purpose of protecting its appropriation from junior Colorado appropriators." *Id.* The

Colorado state courts refused to hear the case in light of the compact's clause about Kansas's "exclusive administrative control" over the Frontier Canal. *Id.* at 1119–20. Frontier Ditch Company argued against the plain meaning of that term, however, because it would allegedly violate Colorado's duty "to protect the right of appropriation." *Id.* at 1123. The Colorado Supreme Court agreed that such a duty existed, but

> recognition of such a duty does not mean that the state is powerless to enter into an interstate compact and thereby delegate this duty to a sister state. Indeed, it has long been accepted that the equitable apportionment of interstate waters may be accomplished through the use of an interstate compact. Even though existing statutory schemes might well result in a different apportionment of waters, the provisions of such a compact bind the states and their citizens. [Citing *Hinderlider*.] Clearly, if a state may equitably apportion interstate waters through the use of an interstate compact, a state may also agree that the sister state to which the water is equitably apportioned will have exclusive authority over the determination of an applicant's right to divert the water and the administration of any such decreed water right.

*Id.* at 1123 (citations omitted). The Colorado Supreme Court also reasoned that "the Compact here is not only part of our state statutory law, but is also part of federal law, having been approved by an act of Congress . . . , and is thus preemptive of any conflicting state law on the same subject." *Id.*

Amica recognizes that the second reason does not have any force in the instant dispute. (ECF No. 67 at 13–14 n.3.) But Amica highlights the Colorado Supreme Court's statement from the above-quoted paragraph that "[e]ven though existing statutory schemes might well result in a different apportionment of waters, the provisions of such a compact bind the states and their citizens." (ECF No. 67 at 22 (internal quotation marks omitted).)

*Frontier Ditch* contains no elaboration on this statement. However, the most

natural reading is that the court was referring to Colorado's Water Right Determination and Administration Act of 1969, Colo. Rev. Stat. §§ 37-92-101 to -602 ("Water Act"). *See* 761 P.2d at 1120 & n.2 (summarizing the plaintiff's argument for applying the Water Act). The Water Act establishes, among other things, Colorado's water court system and the principles for resolving water disputes. *See, e.g.*, Colo. Rev. Stat. §§ 37-92-203, -305. When *Frontier Ditch* refers to the possibility that "existing statutory schemes might well result in a different apportionment of waters," it appears to be saying only that procedures may differ between a Colorado water court and a corresponding court or agency in Kansas, and those procedural differences might lead to different outcomes under the circumstances of a particular case.

This is simply an example of the legislature giving and taking away. Under the Water Act, the Colorado Legislature had vested authority in a system of water courts to adjudicate water rights disputes, but under the Arkansas River Compact, the Colorado Legislature carved out a certain part of that authority and transferred it to Kansas's water adjudication system.

In short, *Frontier Ditch*'s statement that the Arkansas River Compact might upset "existing statutory schemes" is not authority for the proposition that the Colorado Legislature may delegate to an interstate agency the discretion to promulgate regulations that conflict with state statutes.

5.    *Hellmuth* (D. Md. 1976)

Amica next cites *C. T. Hellmuth & Associates, Inc. v. Washington Metropolitan Area Transit Authority*, 414 F. Supp. 408 (D. Md. 1976). This case centered around the Washington Metropolitan Area Transit Authority Compact, Pub. L. No. 89-774, 80 Stat. 1324, 1350 (1966), which established the joint public transit system that serves

Washington, D.C., and its Virginia and Maryland suburbs.  The plaintiff had unsuccessfully sought to be the life insurance provider to the Transit Authority and invoked Maryland's freedom-of-information statute to compel the Transit Authority to release information about that the Authority's decision to select another insurer.  414 F. Supp. at 409.  The question presented, therefore, was whether the Transit Authority fell "within the purview of the Maryland Act."  *Id.*  The district court answered in the negative, and in doing so set forth a general principle on which Amica relies, namely, that "[u]pon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law."  *Id.*

This is indeed a very broad statement.  However, Amica fails to address two distinctions.  First, the compact creating the Transit Authority was approved by Congress, and so is necessarily superior to Maryland law.  Second, *Hellmuth* has nothing to do with the precise question at issue, *i.e.*, whether an administrative body created by an interstate compact can promulgate rules that supersede a particular state's statutory enactments.  *Hellmuth* thus provides little guidance in the present circumstances.

6.    *McComb* (3d Cir. 1991)

Amica's next citation is to *McComb v. Wambaugh*, 934 F.2d 474 (3d Cir. 1991). *McComb* was a civil rights action that turned, in part, on whether the Interstate Compact for Placement of Children applied to proceedings purportedly under that compact to return a child to his or her natural parents.  *Id.* at 478–82.  The Third Circuit answered in the negative.  *Id.* at 482.  In the process, it noted certain general principles on which Amica relies: "Having entered into a contract [by joining an interstate compact], a

participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states." *Id.* at 479.

Amica emphasizes *McComb*'s observation that a participant state may not unilaterally change the terms of a compact. Amica seems to be saying that allowing Colorado's one-year suicide exclusion to control despite the Interstate Commission's two-year exclusion is effectively the same as allowing Colorado to unilaterally change the terms of the Insurance Compact. The analogy does not work in these circumstances. A ruling in favor of Wertz would not change the terms of the Insurance Compact. It might change Colorado's relationship to the Insurance Compact, although, as already noted, this Court's ruling only binds the parties before it.[11] It also may call into question whether Interstate Commission-approved policies are truly enforceable as written in Colorado. But the Insurance Compact would remain unaltered.

*McComb*'s assertion that a compact takes precedence over member states' statutes has much more relevance, particularly because the Interstate Compact for Placement of Children (like the Compact at issue here) was *not* approved by Congress. *See id.* Nonetheless, the scope of *McComb*'s assertion is not clear. *McComb* cited nothing to support this proposition, but it is probably unobjectionable if *McComb* meant to say that the terms of a compact, when enacted as a state statute, have superiority when in conflict with other state statutes. In both cases, legislation is at issue, and a state legislature can allow one statute to supersede another.

Again, however, the dispute between Amica and Wertz is not a conflict of statutes. It is a conflict of a preexisting Colorado statute and an administrative

---

[11] *See* n.2, above.

regulation promulgated by an interstate agency created by a Colorado statute. *McComb* has nothing to say on this specific scenario, although perhaps it implies that interstate compacts and everything that flows from them (potentially including administrative regulations) take precedence over conflicting state statutes—otherwise, an interstate compact could not achieve its desired effect. It is nonetheless difficult to be sure that *McComb* meant to go this far, given that the question was not before the court.

Interestingly, *McComb* applied Pennsylvania law to invalidate a regulation promulgated by the interstate commission administering the Interstate Compact for Placement of Children, because the regulation conflicted with the compact itself, which had been enacted in Pennsylvania. *Id.* at 481. Specifically, the commission administering the compact had issued a regulation interpreting the compact to apply to circumstances when a child was being transferred across state lines to live with that child's parent. The Third Circuit found this interpretation untenable in light of the language of the compact itself. But this provides no guidance on whether an interstate administrative body's regulation can supersede some other state statute. Nonetheless, this same dispute will arise again in another case discussed below (Part VI.C.9).

7.    *Alcorn* (D.D.C. 1993)

Amica's next citation, *Alcorn v. Wolfe*, 827 F. Supp. 47 (D.D.C. 1993), explores the relationship between the Metropolitan Washington Airports Authority Compact and Virginia's statute adopting the compact. The compact called for the governor of Virginia to appoint representatives to a joint commission, but Virginia's enabling statute went further to say that the governor's appointments must be confirmed by the Virginia legislature. *Id.* at 48–49. The district court held that the requirement of legislative

approval conflicted with certain portions of the compact and therefore was preempted: "In light of the Supremacy Clause to the United States Constitution, and because compacts are analogous to contracts between states, the terms of the MWAA compact cannot be modified unilaterally by state legislation and [the compact's terms] take precedence over conflicting state law." *Id.* at 52 (citations omitted).

*Alcorn*'s reference to the Supremacy Clause has no relevance here. *Alcorn*'s reference to contract principles similarly has no relevance, as already explained in the prior discussion of the *McComb* decision.

### 8. *Doe* (W.D. Pa. 2000)

Amica also cites *Doe v. Ward*, 124 F. Supp. 2d 900 (W.D. Pa. 2000), which held that the congressionally-approved Interstate Parole Compact prohibited Pennsylvania from imposing different conditions on sex offender parolees transferring from out-of-state than on sex offender parolees convicted of their sex offenses within Pennsylvania. *Id.* at 912–16. Amica cites *Doe* apparently for the same general proposition already discussed in *McComb* and *Alcorn*, namely, that a state may not unilaterally alter an interstate compact. For the same reasons already discussed above, the Court finds that proposition irrelevant here.

### 9. *Leonardo* (Ariz. App. 2001)

Finally, Amica offers *Arizona Department of Economic Security v. Leonardo*, 22 P.3d 513 (Ariz. App. 2001). *Leonardo*, like *McComb*, involved the Interstate Compact on the Placement of Children; and the question presented was the same presented in *McComb*, namely, whether the interstate commission administering that compact validly interpreted it to apply to situations in which a child is being transferred across state lines to live with the child's parent. In analyzing this question, the Arizona court first observed

that, "[b]y adopting the [compact], enacting [the enabling legislation], and delegating a representative of this state to participate in the activities of the [interstate commission charged with administering the compact], Arizona has implicitly agreed to accept and abide by rules or regulations duly promulgated by the [commission]." *Id.* at 518. The court then went on to examine whether the commission's interpretation of the compact was *ultra vires*, and found to the contrary (disagreeing with *McComb*). *Id.* at 519–22.

Amica naturally emphasizes *Leonardo*'s language about the duty to abide by an interstate commission's rules and regulations. And in the context of the Insurance Compact, the words of *Leonardo* could likely be said of Colorado: Colorado has adopted the Insurance Compact through enabling legislation and a Colorado representative has been designated to participate in the Interstate Commission's activities, so Colorado must likewise accept the Interstate Commission's rules and regulations. But if Amica means to say that all of this is true *even if the legislature exceeded its constitutional authority to delegate when it enacted the Compact*, then all the concerns discussed above regarding Justice Reed's and Justice Jackson's *Dyer* concurrences return. (*See* Part VI.C.3.) To accept this principle would be to grant state legislatures power to override their own constitutions simply by managing to enter into a compact before a judicial challenge could stop it.

    10.    Synthesis

As is clear above, Amica's and *amici*'s position reduces to the argument that an interstate compact is impervious to state constitutional challenge once enacted— enacted, ironically, through the procedure set down in the state constitution. Amica and *amici* would endorse the assertion in the *Interstate Compacts* treatise that "[t]he subject matter and powers specified in an interstate compact are not . . . limited by any specific

32

state constitutional restrictions; rather as with any 'contract,' the subject matter is largely left to the discretion of the parties." *Interstate Compacts* § 1.2.1, at 16 (footnote omitted). The treatise goes on, mincing no words in its assertion that "[o]nce a state enacts a compact, the terms of the compact and any rules and regulations authorized by the compact to the extent provided in the agreement, supersede any substantive state laws that may be in conflict regardless of [whether Congress approves]." *Id.* § 3.4, at 103.

Whether any of this is true *in a dispute between compacting states* is not a matter before this Court. The question, rather, is whether a private party affected by the terms of an interstate compact can challenge a state's constitutional authority to enter into that compact, and the answer cannot be, "No, because the compact's enactment is a *fait accompli*." Indeed, the *Dyer* case itself makes little sense unless one accepts that, in theory at least, a party may challenge an interstate compact as beyond the state legislature's state constitutional power to adopt.[12]

To illustrate this point, the Court concludes this section with an extreme hypothetical, and then a more realistic hypothetical, both of which test the limits of the approach advocated by Amica and its *amici*. First, imagine an "interstate legislation compact," which provides that legislation drafted and proposed by an interstate commission may be enacted into law by the state legislature without the governor's signature, or with only the vote of one house of the state legislature (assuming there are two), or with less than a majority of state legislators voting in favor. Under Amica's and *amici*'s view, there is nothing wrong with such a compact because it exists in "a 'space'

---

[12] The *fait accompli* approach equates to Justice Jackson's estoppel theory that the *Dyer* majority did not endorse.

between what is purely state authority and what is purely federal authority." *Interstate Compacts* § 1.2.1, at 11. But it is undeniably, in effect, a sea-change amendment to the state's constitution.

Second, and less dramatically, imagine an interstate civil procedure compact designed to standardize the rules of civil court proceedings as much as possible across states. This presents questions unique to Colorado and other states with similar constitutions. In Colorado, unlike in the federal system, the power to make rules of court procedure is granted by the state constitution to the judicial branch: "The supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases . . . ." Colo. Const. art. VI, § 21. This authority is exclusive, and a legislative enactment that purports to establish or modify procedural court rules is void. *See, e.g.*, *Borer v. Lewis*, 91 P.3d 375, 380 (Colo. 2004). From Amica's and *amici*'s vantage point, however, the state constitutional restriction is immaterial—so long as the state legislature enacts the compact and the governor signs it, the matter is settled and the state constitution is irrelevant.

This Court cannot predict how the Colorado Supreme Court would ultimately rule in any challenge to this hypothetical interstate civil procedure compact. That said, the Court is confident the Colorado Supreme Court would *not* throw up its hands and declare the matter unreviewable on solely account of the interstate-compact nature of the legislation.

**D.    May the Colorado Legislature Delegate Comparable Power to a Colorado Agency?**

The Court thus returns to the first question (*see* Part VI.B, above): may the

Colorado Legislature delegate to a Colorado administrative agency the discretion to promulgate regulations that substantively modify state statutes? And, to be clear, the ITLIP Standards *do* substantively modify Colorado Revised Statute § 10-7-109. The relevant portion of that statute reads, "The suicide of a policyholder after the first policy year of any life insurance policy issued by any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy . . . ." The ITLIP Standards effectively amend the language to include an exception for insurance policies approved by the Interstate Commission.

1.    The Effect of *Liebhardt*

As noted, the Colorado Supreme Court has previously declared that

> a regulation must further the will of the legislature and may not modify or contravene an existing statute. [Citing, among other decisions, *In re Liebhardt's Estate*, 290 P.2d 1107 (Colo. 1955).] Thus, any regulation which is inconsistent with or contrary to a statute is void and of no effect.
>
> * * *
>
> Only the legislature has the power to amend laws . . . .

*Miller*, 646 P.2d at 345, 346. But the *Liebhardt* decision on which the Colorado Supreme Court relied significantly qualifies this language.

The question in *Liebhardt* was whether the Colorado Inheritance Tax Commissioner had adopted a proper method for computing a tax credit when the statute creating the tax credit provided no method. 290 P.2d at 1108. Before answering the question, the Colorado Supreme Court announced the following general principle of Colorado administrative law: "Rules and regulations adopted by a department of government, *unless expressly or impliedly authorized by statute*, are without force or effect if they add to, change or modify existing statutes." *Id.* (emphasis added). In other

words, the Colorado Supreme Court declared that the Colorado Constitution does *not* prohibit the Legislature from expressly or impliedly authorizing a Colorado administrative agency to modify existing Colorado statutes through regulation.

In a diversity case turning on questions of Colorado law, this Court must abide by the Colorado Supreme Court's answers. *See Comm'r v. Bosch's Estate*, 387 U.S. 456, 465 (1967) (in diversity cases, "state law as announced by the highest court of the State is to be followed"). Conceivably, however, the above-quoted language from *Liebhardt*, or at least the italicized portion, is dicta. The Colorado Supreme Court cited nothing to support that statement, and—as far as the *Liebhardt* opinion reveals—the question of whether the Colorado Legislature expressly or impliedly authorized statutory modification by regulation was not at issue. But if dicta, then this Court's task would be to predict what the Colorado Supreme Court would say if squarely presented with the question. *See id.*; *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

Here, the best evidence of what the Colorado Supreme Court would say is *Liebhardt* itself, along with *Graham Furniture Co. v. Industrial Commission*, 331 P.2d 507, 510 (Colo. 1958) (quoting *Liebhardt* for this same proposition), followed by statements from the Colorado Court of Appeals that extend *Liebhardt* to include "conflicts with an existing statute," not just additions, changes, or modifications, *Sears v. Romer*, 928 P.2d 745, 751 (Colo. App. 1996); *Adams v. Colo. Dep't of Soc. Servs.*, 824 P.2d 83, 86 (Colo. App. 1991); *Lorance v. Colo. State Bd. of Examiners of Architects*, 532 P.2d 382, 384 (Colo. App. 1974); *see also West v. AT&T Co.*, 311 U.S. 223, 237 (1940) (a state intermediate appellate court's decision of state law is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is

convinced by other persuasive data that the highest court of the state would decide otherwise").

Of course, the invocation of *Liebhardt* in all of these cases might also be dicta because none appears to turn on a question of whether there existed express or implied legislative authorization to modify or conflict with an existing Colorado statute. But again, they remain the best evidence of what the Colorado Supreme Court would do and so, if needed, this Court would predict that the rule of *Liebhardt* is indeed the rule the Colorado Supreme Court would adopt if squarely presented with the question.

In this light, the Court holds that the Colorado Legislature may delegate to a state administrative agency the legal authority to modify existing state statutes, and such a delegation need not be expressly stated in the relevant legislation. Rather, implication may be enough.

Here, by enacting the Compact, the Colorado Legislature gave express authority to the Interstate Commission to adopt Uniform Standards that control over conflicting state laws as to the content of Commission-approved insurance policies:

> a. Nothing herein prevents the enforcement of any other law of a Compacting State, except as provided in Paragraph b. of this Article.[13]
>
> b. For any Product approved or certified to the Commission, the Rules, Uniform Standards and any other requirements of the Commission shall constitute the exclusive provisions applicable to the content, approval and certification of such Products. . . .

Colo. Rev. Stat. § 24-60-3001, art. XVI, § 1. And even if this did not amount to an express delegation, it is obvious from the structure and stated purposes of the

---

[13] So in original. Should probably be "Paragraph b. of this <u>Section</u> [*i.e.*, art. XVI, § 1]."

Insurance Compact that the Interstate Commission will sometimes promulgate Uniform

Standards that do not match the corresponding standards in compacting states' existing

insurance statutes. Legislative history, moreover, suggests that the Colorado

Legislature fully understood that the purpose of the Compact was to allow the Uniform

Standards to control over any state statute that would dictate a different rule. (*See* ECF

No. 80-1 at 7 (quoting a state senator's statement in a hearing on the Insurance

Compact that it would "bypass our state law" on matters within its purview); ECF No. 81

at 10 n.7 (summarizing information provided by the Colorado insurance commissioner

to the Colorado Senate regarding the Compact, including a frequently asked questions

handout stating that the "Compact replaces conflicting state law for products approved

by the commission").) In short, the Colorado Legislature's adoption of the Insurance

Compact could also be construed as the type of implied authorization to modify existing

Colorado statutes that, according to *Liebhardt*, is not *per se* unconstitutional under the

Colorado Constitution.

        2.   Applying The *Cottrell* Test

Even if a particular delegation is not *per se* unconstitutional, it must still pass

muster under the Colorado Supreme Court's *Cottrell* test, which is Colorado's

application of what is generally known in administrative law as the "nondelegation

doctrine." *See Cottrell*, 636 P.2d at 708.

> [T]he test is . . . whether there are sufficient statutory
> standards and safeguards and administrative standards and
> safeguards, in combination, to protect against unnecessary
> and uncontrolled exercise of discretionary power. The
> guiding consideration is whether these constraints are
> sufficient to insure that administrative action will be rational
> and consistent in the first instance and that subsequent
> judicial review of that action is available and will be effective.
> Therefore, the appropriate analysis is to determine first

whether sufficient statutory standards or safeguards exist to
fulfill these functions.  Second, if those standards and
safeguards are inadequate, it must be determined whether
additional administrative standards and safeguards
accomplish the necessary protection from arbitrary action.

*Id*. at 709–10 (citations and footnote omitted).  "Statutory standards" refers to guidance

regarding the content of regulations, whereas "statutory . . . safeguards" refers to the

procedural matters, such as the procedures for adopting or challenging regulations.

*See People v. Peterson*, 734 P.2d 118, 121–22 (Colo. 1987).

As relevant here, the Insurance Compact's statutory standards comprise at least

the following:

- "The purposes of this Compact are * * * [t]o promote and protect the
  interests of consumers of individual and group annuity, life insurance,
  disability income and long-term insurance products; [and] [t]o develop
  uniform standards for insurance products covered under the Compact
  . . . ."  Colo. Rev. Stat. § 24-60-3001, art. I, §§ 1–2.

- "[E]ach Uniform Standard shall be construed, whether express or implied,
  to prohibit the use of any inconsistent, misleading or ambiguous provisions
  in a Product and the form of the Product made available to the public shall
  not be unfair, inequitable or against public policy as determined by the
  Commission."  *Id*., art. II, § 15.

- "The Commission shall promulgate reasonable Rules, including Uniform
  Standards, and Operating Procedures in order to effectively and efficiently
  achieve the purposes of this Compact."  *Id*., art. VII, § 1.

Wertz argues that these standards lack substance because they say nothing

about "what the contents of the standard should be, how they should be formulated, or guidelines or minimum standards that must be met." (ECF No. 70 at 15–16.) If Wertz means to say that the statutory standards are not detailed, the Court agrees. But he is simply incorrect to assert a lack of, for example, "guidelines or minimum standards." The foregoing provisions bind the Interstate Commission to promulgate Uniform Standards consistent with its purposes. These standards appear adequate in light of others the Colorado Supreme Court has approved. *See, e.g.*, *People v. Lowrie*, 761 P.2d 778, 779 (Colo. 1988) (upholding delegation of liquor regulation where statutory standards required "reasonable and just" rules that were "necessary for the proper regulation and control" of liquor sales and enforcement of liquor laws); *Cottrell*, 636 P.2d at 710 (upholding delegation of rate-setting authority where the substantive standards called for rates that were "uniform as far as practicable" and "as low as good service will permit").

In any event, the Court must also look at statutory safeguards. *See id.* In that regard:

- The Colorado Insurance Commissioner sits as Colorado's representative on the Interstate Commission. Colo. Rev. Stat. § 24-60-3001, Preamble.

- The Commission follows "a rulemaking process that conforms to the Model State Administrative Procedure Act of 1981 as amended, as may be appropriate to the operations of the Commission." *Id.*, art. VII, § 2.

- Two-thirds of Commission members must vote to adopt a Uniform Standard. *Id.*, art. V, § 1(b).

- "Before the Commission adopts a Uniform Standard, the Commission

shall give written notice to the relevant state legislative committee(s) in each Compacting State responsible for insurance issues of its intention to adopt the Uniform Standard." *Id.*, art. VII, § 2.

- By legislation, Colorado may always opt out of a Uniform Standard. *Id.*, art. VII, § 4.

- By regulation, the Colorado insurance commissioner may opt out of a Uniform Standard within ten business days of its promulgation. *Id.*

- Within thirty days of a Uniform Standard's promulgation, "any person may file a petition for judicial review." *Id.*, art. VII, § 7.

Wertz argues that these safeguards are "inadequate" by focusing on the Legislature's ability to opt out and noting that the Interstate Commission "does not give regard to whether the legislature is in session when it sends the Legislative Notice." (ECF No. 70 at 16.) Wertz acknowledges that the Legislature may nonetheless opt out at any time, but notes that any such opt-out would be prospective only, so some Colorado consumers might still be subject to Uniform Standards that went into effect in the meantime. (*Id.* at 16–17.)

The legislative opt-out procedure is not optimal, but the Court cannot say it is inadequate. *Cf. Cottrell*, 636 P.2d at 710 (upholding rate-setting regime that "provide[d] adequate, although not optimal, protection from abuse"). Moreover, although it is probably the most important procedural protection, it is not the only procedural protection. Wertz does not address why the legislative opt-out procedure, in combination with all of the other procedural safeguards, fails to "to insure that administrative action will be rational and consistent in the first instance and that

subsequent judicial review of that action is available and will be effective." *Id.* at 709.

"[V]iolation of the nondelegation doctrine has been an argument frequently invoked but seldom sustained." *Id.* at 708. In Colorado, "the legislative department of government does not abdicate its lawmaking function when it describes what job must be done, who must do it, and the scope of his authority." *Lowrie*, 761 P.2d at 781 (internal quotation marks omitted). Here, the Court finds that the Insurance Compact would satisfy the *Cottrell* test if the agency receiving the delegated authority was a Colorado administrative agency. There is no reason, then, why the Colorado Legislature could not have delegated the same authority to an interstate administrative agency. Consequently, the Insurance Compact does not violate Colorado's nondelegation doctrine. In turn, the two-year suicide exclusion in the ITLIP Standards is valid and controlling in these circumstances and Amica properly refused to pay the death benefit.

### E.    Lingering Questions

The foregoing analysis is in some ways unsatisfying because of its implications. At least from a nondelegation perspective, *Liebhardt* and *Cottrell* together suggest that the Colorado Legislature could create an "All-Statutes Review Commission" with power to supplant the entire Colorado Revised Statutes with administrative regulations, assuming adequate standards and safeguards. In other words, the Legislature could relegate itself to a purely veto role. Perhaps the Colorado Supreme Court would deem that a bridge too far—perhaps, as a matter of law, no standards or safeguards are adequate when the Legislature delegates its entire police power—but nothing in *Liebhardt* or *Cottrell* logically dictates as much.

The interstate compact context also raises interesting questions. If *Liebhardt* and

*Cottrell* reflect administrative law in other states, then uniform state-law advocates have been approaching their task the wrong way.  Drafters of model legislation should instead draft an interstate compact embracing a particular subject and lobby for the interstate compact's adoption in the various states.  Then a regulatory body created by the compact could adopt, modify, and repeal substantive standards that otherwise would have been in a model act, all without having to return to any state's legislature to lobby for further approval.  Indeed, one could imagine an "Interstate All-Statutes Review Commission" that effectively acts as an interstate legislature.  But that is a matter, if ever, for another day.[14]

## VII.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Motion for Summary Judgment (ECF No. 67) is GRANTED;

2. The Court hereby DECLARES that Plaintiff properly denied the death benefit claimed by Defendant, and has no obligation to Defendant other than to refund the policy premium paid by the insured; and

3. The Clerk shall enter judgment in favor of Plaintiff and against Defendant and shall terminate this case.  Each party shall bear its own attorney fees and costs.

---

[14] The Prior Order posits "an interstate uniform criminal law compact" that supersedes local criminal laws and an "interstate commercial law compact" that dispenses with the need for legislative approval to update the UCC.  *Wertz*, 272 F. Supp. 3d at 1253–54.  In the many pages of supplemental briefing since filed, no party addresses these hypotheticals.

Dated this 19th day of October, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge